1  GLEN E. SUMMERS (SBN 176402)
   Email: glen.summers@bartlit-beck.com
2  KARMA M. GIULIANELLI (SBN 184175)
   Email: karma.giulianelli@bartlit-beck.com
3  JASON C. MURRAY (*pro hac vice*)
   Email: jason.murray@bartlit-beck.com
4  BARTLIT BECK HERMAN PALENCHAR & SCOTT LLP
   1899 Wynkoop Street, 8th Floor
5  Denver, Colorado 80202
   Telephone: (303) 592-3100
6  Facsimile: (303) 592-3140

7  PAUL D. MURPHY (SBN 159556)
   Email: pmurphy@murphyrosen.com
8  MARK J. NAGLE (SBN 248873)
   Email: mnagle@murphyrosen.com
9  JASON L. LIANG (SBN 251235)
   Email: jliang@murphyrosen.com
10 MURPHY ROSEN LLP
   100 Wilshire Boulevard, Suite 1300
11 Santa Monica, California 90401
   Telephone: (310) 899-3300
   Facsimile: (310) 399-7201

12

13

14        **UNITED STATES DISTRICT COURT**

15   **CENTRAL DISTRICT OF CALIFORNIA, SOUTHERN DIVISION**

16

17 | STATE COMPENSATION              | CASE NO. SACV12-01072 CJC (JCGx)
18 | INSURANCE FUND, a Public
     Enterprise Fund and Independent
19 | Agency of the State of California,

     Plaintiff,

20 | vs.

21 | SANA ULLAH KHAN, an individual;
     et al.

22

23          Defendants.

24

25 AND RELATED CROSS-ACTION

**THE ZAKS DEFENDANTS'
NOTICE OF MOTION, MOTION,
AND MEMORANDUM OF POINTS
AND AUTHORITIES IN SUPPORT
OF MOTION TO EXCLUDE
EXPERT TESTIMONY OF DANIEL
KESSLER**

Date:   March 21, 2016
Time:  3:00 p.m.
Place: Courtroom 9B

26

27

28

**TO THE COURT, THE PARTIES AND THEIR ATTORNEYS OF RECORD:**

    **PLEASE TAKE NOTICE** that on March 21, 2016, at 3:00 p.m. or as soon thereafter as may be heard, in Courtroom 9B of the above-entitled Court, located at 411 W. Fourth Street, #1053, Santa Ana, California, 92701-4516, the Zaks Defendants will move, pursuant to Federal Rule of Evidence 702, to exclude the expert testimony of Daniel Kessler.

    This motion is made on the grounds that Dr. Kessler's opinions are not the product of reliable principles and methods and that Dr. Kessler has not reliably applied the principles and methods to the facts of the case.

    This motion is based upon (a) this Notice of Motion and Motion; (b) the Memorandum and Points of Authority in support of this motion; and (c) upon the other pleadings and papers on file in this action.[1]

DATED: February 29, 2016        Respectfully submitted,

                                BARTLIT BECK HERMAN PALENCHAR & SCOTT LLP

                By:    */s/ Glen E. Summers*
                        Glen E. Summers
                        Attorneys for the Zaks Defendants

---

[1] This motion is made following the conference of counsel pursuant to Local Rule 7-3 which took place on February 22nd and 25th, 2016.

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................. 1

BACKGROUND .................................................................................................. 1

    A.    Dr. Kessler's Opinion That Defendants' Conduct Caused Higher
           Medical Spending By SCIF ...................................................................... 1

    B.    Dr. Kessler's Opinion That Defendants' Conduct Caused Higher
           Spending By Non-Defendant Doctors ..................................................... 4

    C.    Dr. Kessler's Opinion That the Defendants Provided
           "Inappropriate Medical Care" .................................................................. 6

    D.    Dr. Kessler's Opinion That Defendants' Conduct "Caused"
           Higher Medical Spending on Patients at Comprehensive ................... 7

    E.    Dr. Kessler's Rebuttal Opinion That the Settlement in This Case
           Was the Product of Fraud ........................................................................ 8

ARGUMENT...................................................................................................... 10

I.    Dr. Kessler's Opinion That Defendants' Conduct Caused Higher
      Medical Spending By SCIF Is Unreliable and Should Be Excluded............ 11

    A.    Dr. Kessler's Methodology for Inferring Causation in This Case
           Contradicts His Own Published Studies ............................................... 12

    B.    Dr. Kessler Admits He Cannot Rule Out That Unobserved
           Differences in Severity Explain the Difference in Medical
           Payments ................................................................................................. 15

    C.    Dr. Kessler's Opinion That Differences in Injury Severity Are
           "Implausible" Is Unreliable .................................................................. 17

II.   Dr. Kessler's Opinion That Defendants' Conduct Caused Higher
      Spending By Non-Defendant Doctors Is Unreliable and Should Be
      Excluded ....................................................................................................... 19

III.  Dr. Kessler's Opinion That Defendants Provided "Inappropriate
      Medical Care" Is Unreliable and Unsupported By Relevant
      Expertise ...................................................................................................... 20

IV.  Dr. Kessler's Opinion That Defendants' Conduct Caused Higher
      Medical Spending by SCIF on Comprehensive Patients Is
      Unreliable and Should Be Excluded ........................................................... 22

V.   Dr. Kessler's Rebuttal Opinion That the Settlement in This Case
      Was the Product of Fraud Is Unreliable and Unsupported By
      Relevant Expertise....................................................................................... 23

CONCLUSION................................................................................................... 25

# <u>TABLE OF AUTHORITIES</u>

**Cases**

*Berry v. City of Detroit,*
25 F.3d 1342 (6th Cir. 1994) ............................................................... 24

*Clausen v. M/V NEW CARISSA,*
339 F.3d 1049 (9th Cir. 2003), *as amended on denial of reh'g*
(Sept. 25, 2003) ........................................................... 11, 12, 17

*Daubert v. Merrell Dow Pharm.,*
509 U.S. 579 (1993) ........................................................... 17

*Estate of Barabin v. AstenJohnson, Inc.,*
740 F.3d 457 (9th Cir. 2014) ........................................................... 10, 11

*In re Silicone Gel Breast Implants Prods. Liab. Litig.,*
318 F. Supp. 2d 879 (C.D. Cal. 2004) ........................................... 14

*Lindy Pen Co. v. Bic Pen Corp.,*
982 F.2d 1400 (9th Cir. 1993), *superseded by statute on other
grounds* ........................................................... 20

*Lust By & Through Lust v. Merrell Dow Pharm., Inc.,*
89 F.3d 594 (9th Cir. 1996) ........................................................... 14

*Wecosign, Inc. v. IFG Holdings, Inc.,*
845 F. Supp. 2d 1072 (C.D. Cal. 2012) ........................................... 20

**Statutes**

Cal. Lab. Code § 4603.2 ........................................................... 9, 25

Cal. Lab. Code § 5814 ........................................................... 9

**Rules**

Fed. R. Evid. 702 ........................................................... 10

Fed. R. Evid. 702 advisory committee's notes, 2000 Amendments ................ 20

**Other Authorities**

Federal Judicial Center, *Reference Manual on Scientific Evidence*
(3d ed. 2011) ........................................................... 12, 17, 18

## MEMORANDUM OF POINTS AND AUTHORITIES

### INTRODUCTION

This motion seeks to exclude certain opinions offered by SCIF's expert witness Daniel Kessler.  Dr. Kessler, a health care economist who teaches at Stanford's law and business schools, has provided SCIF's expert opinions on causation and damages in this case.  Ex. 1, Expert Report of Daniel Kessler ("Kessler Report") ¶ 1.  Dr. Kessler's principal opinions are based on statistical analyses from which he infers that the Defendants provided inappropriate medical care to their patients and thereby caused SCIF to incur higher rates of medical spending.

Dr. Kessler's opinions in this case do not meet the reliability standard for admissible expert testimony under Federal Rule of Evidence 702.  The methodologies underlying several of Dr. Kessler's opinions are not only unsupported by any peer-reviewed literature in the field, but are also *directly contrary* to Dr. Kessler's own published work or that of the authors he cites in his report.  Dr. Kessler bases other opinions merely on his own untested speculation, rather than rigorous scientific analysis.  And in some cases, Dr. Kessler simply lacks any expertise pertinent to the opinion he proffers.  These opinions have the hallmarks of made-for-litigation guesswork rather than rigorous social science.  They are unreliable and should be excluded.

### BACKGROUND[1]

**A.   Dr. Kessler's Opinion That Defendants' Conduct Caused Higher Medical Spending By SCIF**

Dr. Kessler's primary opinion in this case is that Defendants' conduct caused

---

[1] For the sake of efficiency, this motion assumes familiarity with the general factual background and evidence submitted in connection with the Zaks Defendants' motion for summary judgment.  Capitalized terms not defined herein are intended to have the definitions given to them in the Zaks Defendants' summary judgment briefs.

"increased spending on medical services for SCIF."  Ex. 2, Deposition of Daniel Kessler ("Kessler Dep.") 67:12-19; *see also* Ex. 1, Kessler Report ¶ 3.  To support that opinion, Dr. Kessler calculated SCIF's per-patient medical spending on the 1,200 patients who were treated by the Zaks Defendants and whose claims were at issue in the Consolidated Action before the WCAB (the "Case Claimants").  Ex. 1, Kessler Report 2 n.5.  Dr. Kessler then collected data on SCIF's medical spending for a number of so-called "Comparison Claimants" that were purportedly selected at random from the same geographic regions, and with similar dates-of-injury, as the Case Claimants.  *Id.* ¶¶ 6-10; Ex. 2, Kessler Dep. 67:20-68:2.[2]  Finally, Dr. Kessler performed a regression analysis, from which he claimed to find a statistically significant difference in per-patient medical spending between Case Claimants and Comparison Claimants.  Ex. 1, Kessler Report ¶¶ 17-21.

Dr. Kessler acknowledged, however, that the difference in medical spending between Case and Comparison Claimants does not necessarily prove that the Defendants' conduct caused this difference.  Ex. 2, Kessler Dep. 68:14-69:4.  After all, "if Case Claimants have greater medical needs than Comparison Claimants, or higher spending for some other reason not due to Defendants' conduct, then the observed difference between Case and Comparison Claimants will overstate the difference caused by Defendants' conduct."  Ex. 1, Kessler Report ¶ 7.  Consequently, as Dr. Kessler admitted in his report, in order to draw conclusions about whether the Zaks Defendants *caused* the higher medical costs, it was essential "to make the two groups as similar as possible, except for the fact that Case

---

[2] Although not the basis for this motion, Dr. Kessler's calculation of medical spending on Case Claimants is highly suspect.  For Comparison Claimants, Dr. Kessler draws his "medical spending" from the corresponding fields in SCIF's payment data.  Ex. 1, Kessler Report App. D at 3.  However, for Case Claimants, Dr. Kessler uses the settlement checks SCIF paid to settle the Consolidated Action rather than the lower rates of "medical payment" in SCIF's data.  *Id.*  Those checks reflect not merely payment for medical services, but also the significant potential liability for interest and penalties that SCIF would have faced in the arbitration.

1  Claimants were under Defendants' care and Comparison Claimants were not." *Id.*

2  at ¶ 7.

3      Despite this acknowledgement, Dr. Kessler's regression analysis did not

4  control for *any* variables that measured the severity of a patient's injury.  Dr.

5  Kessler controlled for the variables of the claimants' "gender, age, industry,

6  occupation, job tenure, injury type, and weekly wage." *Id.* at ¶ 11.  Notably, none

7  of these variables contained any information about the severity of the claimants'

8  injuries.[3]  The closest Dr. Kessler came to controlling for injury severity in his

9  regression analysis was his "injury type" variable.  But that variable coded only for

10  broad categories of injury, and Dr. Kessler admitted that different injuries within

11  the same category could fall along the full spectrum from "very severe" to "not

12  severe." Ex. 2, Kessler Dep. 84:3-86:5.  For instance, Dr. Kessler's category for

13  "Spine (Back and Neck) Sprains, Strains, and Non-Specific Pain" would include

14  everything from mild back strain to a catastrophic back injury requiring emergency

15  surgery.  *See* Ex. 1, Kessler Report App. C.

16      Without any variable to control for injury severity, Dr. Kessler repeatedly

17  admitted in his deposition that his regression "can't rule out that differences in

18  spending between the case and comparison claimants might be explained by

19  differences in the severity of injuries between the two groups" rather than by the

20  Defendants' conduct.  Ex. 2, Kessler Dep. 90:5-21; *see also id.* 97:20-99:17,

21  185:15-25.  In fact, he admitted that it is "impossible to determine exactly how

22  much or if any . . . of the effect that's being estimated is attributable to unobserved

23  factors." *Id.* 161:22-162:7.  The inability "to rule out that . . . unobserved

24  severity explains some of the effect," in the absence of a control variable built into

25

26  ---

[3] Although Dr. Kessler asserted in his deposition that some of these variables (such
27  as age or occupation) might *correlate* with injury severity, he acknowledged the
obvious fact that these variables do not necessarily indicate whether a particular
28  patient's injury was more or less severe.  Ex. 2, Kessler Dep. 82:6-86:5.

the regression, is a "fundamental problem with all observational research" on medical spending. *Id.* 161:6-21.

Unable to rule out that alternative explanation through any statistical or scientific analysis, Dr. Kessler simply declared that he did not believe it "plausible" that the difference in spending was due to differences in injury severity between the Case and Comparison Claimants. *Id.* 90:5-21, 161:22-162:7, 185:15-25.  But Dr. Kessler does not have any basis to say what the actual difference in spending *would have been* had the two populations been the same, properly taking into account the severity or chronicity of the injuries suffered by both.  His opinion that the difference in spending would not have been "plausible" in the absence of some sort of fraud, therefore, is ungrounded in any analysis or scientific basis.

## B.   Dr. Kessler's Opinion That Defendants' Conduct Caused Higher Spending By Non-Defendant Doctors

Dr. Kessler also provides SCIF's opinion on damages.  Dr. Kessler opines that SCIF's damages "are the amount of money necessary to put it in the position that it would have been, had the Case Claimants been treated by [other] area physicians, rather than by Defendants."  Ex. 1, Kessler Report ¶ 45.  To calculate this amount, Dr. Kessler first takes the average spending per Case Claimant, then subtracts the average spending per Comparison Claimant[4] to calculate the average difference in per-patient spending between the two groups.  *See Id.* at ¶¶ 45-48 & Table 7.  Dr. Kessler then multiples this per-patient spending differential by 1,200 (the number of Case Claimants) to reach a final damages number of roughly $27 million.  *Id*.

Dr. Kessler's damages opinion, however, is not limited to medical payments that SCIF made to the Defendants.  Instead, Dr. Kessler holds the Defendants liable for *all* medical payments incurred by SCIF during the window of time that the

---

[4] After controlling for the variables (e.g. age, occupation, gender) in his regression model.

Defendants treated each Case Claimant (the "treatment window")—even payments made to *non-Defendant medical providers*.  *Id*. at ¶ 13 & Table 7; Ex. 2, Kessler Dep. 205:21-206:2.  Payments to these non-Defendant providers account for roughly $ 8.7 million of Dr. Kessler's alleged damages.  Ex. 1, Kessler Report Table 7.

Dr. Kessler's rationale for including medical payments to non-Defendant providers in his damages calculation was that "Defendants' treatment decisions almost surely affected the treatment decisions of non-Defendants . . . and therefore the payments for Medical Services to non-Defendants."  *Id*. at ¶ 13.  His report provided just a single-sentence justification for this statement: "The current drive in health policy for increased coordination is based on extensive research showing that the decisions of an individual patient's many physicians interact to affect the patient's cost and quality of care."  *Id*.

However, in his deposition, Dr. Kessler admitted that the Defendants' conduct could not be responsible for *all* medical spending by non-Defendant providers during the treatment window, and that he had no basis to quantify what percentage of those payments were attributable to the Defendants.  Dr. Kessler acknowledged that non-Defendant doctors "have their own professional responsibility to provide appropriate treatment to patients," and that the Defendants could not dictate the treatment decisions of non-Defendant providers.  Ex. 2, Kessler Dep. 206:3-25.  Although he argued that the Defendants' conduct had *some* effect on the treatment decisions of non-Defendant providers, he acknowledged that he was not able to "quantify what percentage of payments going to non-defendant providers within the treatment window was attributable to the conduct of defendants."  *Id*. 210:14-25; *see also id*. 208:10-209:3.  Nevertheless, for purposes of calculating damages, Dr. Kessler simply attributed *all* spending and medical decisions from non-Defendant doctors during the treatment window to the Defendants.

### C.   Dr. Kessler's Opinion That the Defendants Provided "Inappropriate Medical Care"

Dr. Kessler is not "an expert in the practice of medicine." Ex. 2, Kessler Dep. 21:16-18. He has neither an M.D. nor a PhD in any medical specialty, and has never practiced medicine. *Id.* 21:19-25. Furthermore, he admits that he does not have "any expertise in determining for any particular patient what is medically necessary or an appropriate course of treatment." *Id.* 23:19-24:4.

Despite this admitted lack of expertise, Dr. Kessler offers an opinion that "Defendants provided inappropriate medical care to Case Claimants." Ex. 1, Kessler Report ¶ 3. Dr. Kessler came to this conclusion even though, as he admitted, he did not "have any information on patient health outcomes in this case," and "was not able to obtain reliable data on the health outcomes of the particular patients." Ex. 2, Kessler Dep. 184:14-185:3.

Instead of assessing the propriety of any particular course of treatment, or providing evidence of patient health outcomes, Dr. Kessler instead points to several facts which he states can *correlate* with poor-quality medical care. First, he observes that the Case Claimants received a larger percentage of certain high-cost treatments (such as prescription drugs or surgery) than Comparison Claimants. He opines that "major surgeries and drugs carry significant risks, and when used inappropriately, have the potential to damage health rather than improve it." Ex. 1, Kessler Report ¶ 32. However, Dr. Kessler provides no analysis to support the assertion that the Zaks Defendants in fact used surgeries or drugs "inappropriately." Moreover, he admitted that it was "impossible," based on the observational data that he used, to determine whether the Case Claimants' population had more severe injuries (which would, of course, necessitate a higher rate of surgeries and medication) than the Comparison Claimants. Ex. 2, Kessler Dep. 161:22-162:7.

Second, Dr. Kessler relies on three supposed "proxies for quality" to opine

that the Defendants provided poor quality care.  First, he "measured the duration of each claimant's treatment," based on the belief that "[a]ll else equal, longer duration claims are associated with poorer outcomes."  Ex. 1, Kessler Report ¶ 41. Second, he relied on the "Bice-Boxerman Index of Fragmentation of Care," which "reflects the extent to which each claimants' number of visits for an episode of care is with a single or group of referred providers."  *Id*.  This is based on Dr. Kessler's assertion that "[s]everal studies have found that continuity of care is associated with lower costs, lower rates of hospitalization, and higher patient satisfaction."  *Id*. Third, and relatedly, Dr. Kessler "counted the number of different medical care providers on average serving each Case and Comparison claimant."  *Id*.  Based on these metrics, Dr. Kessler concludes that "Case Claimants received lower-quality care than Comparison Claimants."  *Id*. at ¶ 42.

All three of these supposed "proxies" have two things in common: (1) none directly measure patient health status, and (2) all three correlate strongly with more severe injuries.  As Dr. Kessler acknowledged in his deposition, "in many cases more severe or more chronic injuries require longer durations of treatment."  Ex. 2, Kessler Dep. 224:8-10.  Similarly, he acknowledged that "discontinuity of medical care between different providers does not necessarily mean that the discontinuity caused poor outcomes."  *Id*. 230:15-19.  After all, "a more complicated medical condition might require treatment by a larger number of providers than a less serious condition," and thus "more severe injuries can result in decreased continuity of care."  *Id*. 228:21-229:11; 230:20-231:16.

**D.    Dr. Kessler's Opinion That Defendants' Conduct "Caused" Higher Medical Spending on Patients at Comprehensive**

In addition to analyzing the 1,200 lien claimants whose claims were part of the Consolidated Action, Dr. Kessler provides a separate damages analysis relating to Comprehensive Outpatient Surgery Center ("Comprehensive").  Ex. 1, Kessler Report ¶¶ 53-56.  As Dr. Kessler acknowledges in his report, "the [Comprehensive]

1    Claimants' treatment patterns differ materially from Case Claimants." *Id*. at ¶ 53.

2          In fact, neither the Defendant doctors nor any doctors affiliated with the Zaks

3    Defendants perform medical procedures at Comprehensive.  Ex. 3, Mar. 29, 2013

4    Decl. of Alexander Zaks in Supp. of Anti-SLAPP Mot., ¶ 17.  Rather,

5    Comprehensive merely owned surgical facilities which it offered for use by third-

6    party doctors in exchange for a facility fee.  *Id*.  Moreover, in this litigation, SCIF

7    does not contend that any of the medical procedures performed at Comprehensive

8    were medically unnecessary, nor does SCIF contest that the patients received the

9    services that were billed.  Ex. 4, SCIF's Supplemental Resp. to Daniel Reyes'

10   Interrog. No. 19; Ex. 5, SCIF's Supplemental Resp. to Reliable's Interrog. No. 10.

11         Despite all of that, Dr. Kessler nevertheless opines that "Defendants' conduct

12   led to radically higher Spending on [Comprehensive] Claimants, relative to what it

13   would have been, had [Comprehensive] Claimants been treated by other area

14   physicians."  Ex. 1, Kessler Report ¶ 54.  To reach this conclusion, Dr. Kessler

15   performed a similar regression analysis comparing Comprehensive Claimants to a

16   group of purported "Comparison Claimants" from the same geographic area.  *Id*.

17         Like his principal regression, Dr. Kessler's analysis of Comprehensive

18   contains no variable to control for the severity of the patients' injury.  This is

19   particularly important because Comprehensive is a surgery center.  By definition,

20   all of Comprehensive's patients were there in order to receive surgery.  Dr. Kessler

21   did not ensure that all of the supposed Comparison Claimants received surgery, nor

22   did he know what percentage of them had done so. Ex. 2, Kessler Dep. 239:16-23.

23   **E.      Dr. Kessler's Rebuttal Opinion That the Settlement in This Case
             Was the Product of Fraud**

24
25         Dr. Kessler has also submitted a rebuttal report responding to the Zaks

26   Defendants' expert, David Hall.  Mr. Hall is a financial and valuation expert with

27   extensive experience in analyzing litigation risk and valuing settlement agreements.

28   Ex. 6, Expert Report of David Hall ("Hall Report") ¶ 2.  Mr. Hall's task was to

compare the amounts of the two settlement agreements in this case to SCIF's potential exposure in the Consolidated Action. He first calculated the amounts owed by SCIF under both the Original Settlement Memorandum and the Re-Settlement Agreements ($9.7 million and $9.9 million, respectively). *Id*. at ¶ 14. He then determined, based upon the claims asserted in the Consolidated Action and Judge Siemers' prior rulings in that case, that SCIF's minimum reasonable exposure in the litigation was $5.5 million and that SCIF's potential exposure (including interest and penalties) was in excess of $25 million. *Id.* at ¶¶ 124-141. On the basis of these calculations, Mr. Hall concluded that "the amounts due under both the April 2010 Resettlement and the October 2009 Settlement compared to the exposure are consistent with an arm's-length negotiation and are not indicative of fraud." *Id*. at ¶ 14.

Dr. Kessler does not refute Mr. Hall's analysis on its own terms. Rather, Dr. Kessler performs his own analysis from which he concludes that "the settlement in this case was the result of fraud or collusion," rather than arm's-length negotiation. Ex. 7, Rebuttal Report of Daniel Kessler ("Kessler Rebuttal Report") ¶ 11. Dr. Kessler first collects "other, comparable lien settlements between State Fund and other health care providers during the same time period." *Id*. at ¶ 4. He asserts that, on average, those "comparable" cases settle for roughly 29% of the amount due. *Id*. By contrast, in this case, Dr. Kessler claims that—after excluding well over $10 million in statutorily mandated interest and penalties from the equation[5]—

---

[5] In his analysis, Dr. Kessler compares the settlement amount to "Hall's Estimated Amount Due without Interest and Penalties," which he lists as $12.7 million. Ex. 7, Kessler Rebuttal Report Table 1. That is nearly $13 million less than the maximum exposure calculated by Mr. Hall after adding statutory interest and penalties. Ex. 6, Hall Report ¶¶ 136-137. Under the relevant statutory provisions, if the Zaks Defendants had prevailed in arbitration, they would have been entitled to mandatory awards of interest at a rate of 10% per year and a 15% penalty, in addition to a potential 25% discretionary penalty. *See* Cal. Lab. Code §§ 4603.2(b)(1)(C)(2), 5814.

the settlement agreements in this case paid the Zaks Defendants roughly 80% of the amount due. *Id.* "Based on the fact that the settlement-to-amount-due ratio in this case was several times larger than the settlement-to-amount-due ratio in other comparable lien settlements," Dr. Kessler "conclude[d] that the terms of the Memorandum are not consistent with arm's-length negotiation." *Id.*

However, in his deposition, Dr. Kessler admitted that he is "not an expert in the settlement of liens of Workers' Compensation." Ex. 2, Kessler Dep. 244:5-17. When pressed to name what factors "drive settlement numbers," Dr. Kessler stated that other than "the amount due on the liens," he "wouldn't know" the factors that drive parties' decisions because he is not an expert in settlement negotiation. *Id.*

Moreover, Dr. Kessler acknowledged he had no basis for determining whether or not his supposedly "comparable lien settlements" were factually comparable to this case. Dr. Kessler's comparison group includes *all* of SCIF's "global lien settlements" (namely, a settlement of more than one lien) during the 2009-2010 time period. *Id.* 241:3-242:3. Dr. Kessler "didn't investigate the facts and circumstances" of any of these comparison settlements to see whether they "had similar facts and circumstances to the settlement of the case claimants here." *Id.* 243:8-17, 245:3-9. For instance, Dr. Kessler did not know how many of his "comparison" cases "involved litigation involving lawyers," *id.* 243:18-24, or whether any of his "comparison" cases involved prior merits rulings adverse to SCIF, *id.* 243:25-244:4.

## ARGUMENT

Under Federal Rule of Evidence 702, expert testimony must meet a threshold of reliability before it may be admitted at trial. "The duty falls squarely upon the district court to act as a 'gatekeeper' to exclude junk science that does not meet Federal Rule of Evidence 702's reliability standards." *Estate of Barabin v. AstenJohnson, Inc.*, 740 F.3d 457, 463 (9th Cir. 2014) (*en banc*) (internal quotation marks and citation omitted). Some of the factors used in determining the reliability

of expert testimony include "1) whether a theory or technique can be tested; 2) whether it has been subjected to peer review and publication; 3) the known or potential error rate of the theory or technique; and 4) whether the theory or technique enjoys general acceptance within the relevant scientific community." *Id.* (citation omitted).

Where there is a reasonable alternative explanation for the data upon which an expert's conclusion rests, "[t]he expert must provide reasons for rejecting alternative hypotheses using scientific methods and procedures and the elimination of those hypotheses must be founded on more than subjective beliefs or unsupported speculation." *Clausen v. M/V NEW CARISSA*, 339 F.3d 1049, 1058 (9th Cir. 2003), *as amended on denial of reh'g* (Sept. 25, 2003) (internal quotation marks and citation omitted).

In this case, the considerable majority of Dr. Kessler's analysis does not meet this standard for reliability. None of the methods that Dr. Kessler employs in this case are supported by peer reviewed literature in his field. To the contrary, many of his opinions employ methodologies are directly contrary to the sources on which he relies or to his own previously published work. Other opinions are unsupported by expertise in the relevant field. And still others are based entirely upon dubious premises which Dr. Kessler admits he has not investigated. These opinions are not the product of reliable methods, and should be excluded.

**I.    Dr. Kessler's Opinion That Defendants' Conduct Caused Higher Medical Spending By SCIF Is Unreliable and Should Be Excluded**

As described in greater detail above, Dr. Kessler's principal opinion is that allegedly improper conduct by Defendants caused SCIF to incur higher medical spending. *See supra* at 1-4. That conclusion is a causal inference from a regression analysis, in which Dr. Kessler finds that SCIF incurred substantially higher per-patient medical bills for the Case Claimants than it incurred for Comparison Claimants.

11

This causal inference suffers from a fatal flaw: Dr. Kessler's regression contains no variable for the severity of the patient's injury, even though the Defendants have consistently maintained that they specifically marketed their practice to a patient subpopulation with disproportionate rates of severe, chronic, and undertreated injuries.  *See generally* Ex. 8, Deposition of Alexander Zaks 65:22-77:21; *see also* Ex. 1, Kessler Report App. B (listing Dr. Zaks' deposition among materials considered).  As Dr. Kessler has acknowledged in both his published work and his deposition, without controlling for injury severity, it is "impossible" to rule out that the difference in spending was caused by improper conduct on the part of the Defendants.  Ex. 2, Kessler Dep. 90:5-21, 97:20-99:17, 161:22-162:7, 185:15-25.

Although regression analysis can be a valuable scientific tool, "when inappropriately used, regression analysis can confuse important issues while having little, if any, probative value."  Federal Judicial Center, *Reference Manual on Scientific Evidence* 308 (3d ed. 2011).  Dr. Kessler's failure to rigorously rule out likely alternative explanations renders his opinion on causation unreliable and inadmissible.  *See e.g., Clausen*, 339 F.3d at 1058.

## A.   Dr. Kessler's Methodology for Inferring Causation in This Case Contradicts His Own Published Studies

Dr. Kessler cites no literature which states that it is possible to infer fraud or abuse from a difference in medical spending between two patient populations without the presence of some variable measuring whether the two patient populations have similarly severe injuries.  To the contrary, Dr. Kessler's own published work has criticized other observational studies on precisely this ground.  In an article he co-authored entitled "Detecting Medicare Abuse," Dr. Kessler wrote specifically about the conditions under which an observational study can support an inference of fraud or abuse:

> [B]ecause observational data contains information only on total billings (or some variant thereof . . .), reported correlations between

patient or provider characteristics and billings could be due to differences in fraud or abuse, or to differences in valid billings across provider types.  Distinguishing between fraud or abuse from valid differences in billings across providers requires the additional assumption that there are no differences across providers in their characteristics or the unobserved characteristics of their practice that affect valid billings—*an assumption that is likely to be incorrect* (e.g., Kessler and McClellan (2001)).  And, existing studies on observational data do not investigate the consequences of allegedly abusive treatment for patient health outcomes; without information on outcomes, classification of a pattern of treatment as abusive *is necessarily speculative*.

Ex. 9, David Becker, Daniel Kessler & Mark McClellan, *Detecting Medicare Abuse*, NBER Working Paper 10677, at 9-10 (August 2004) (emphasis added).

Dr. Kessler's published work could thus not be clearer: Observational studies showing a difference in medical spending do not support an inference of fraud or abuse unless (1) there are no differences in unobserved characteristics of the patient populations (such as injury severity), and (2) the data demonstrates that the higher spending was not associated with better health outcomes.  *Id.*

Dr. Kessler has not provided data in support of either of these essential premises in this case.  Dr. Kessler admittedly "was not able to obtain reliable data on the health outcomes of the particular patients."  Ex. 2, Kessler Dep. 184:14-185:3.  Nor was he able to out, based on his analysis in this case, that the difference in medical spending on Case Claimants was the product of a more severely injured patient population.  *Id.* 90:5-21, 97:20-99:17, 161:22-162:7, 185:15-25. Consequently, by his own logic, Dr. Kessler's conclusion that higher spending in this case was the product of fraud or abuse (rather than medically necessary treatment) is "necessarily speculative" and based on an assumption of similarity between the two patient populations "that is likely to be incorrect."

This stands in stark contrast to the more rigorous and reliable methods employed by Dr. Kessler in his own published works.  For instance, in "Detecting Medicare Abuse," Dr. Kessler and his co-authors did not simply equate higher billings with fraud or abuse.  Instead, they "classif[ied] treatment behavior as abusive" only "if it has no significant measured consequences for patient health," as

1   determined by a rich set of data on patient health outcomes considered in the study.

2   Ex. 9, at 6.  They did so because "[i]f we neglect to measure the important health

3   benefits of a given form of treatment. . . then we may classify hospitals that supply

4   such treatment as abusive even if they are providing valuable services to their

5   patients."  *Id*.

6         In another study, Dr. Kessler sought to determine whether patient preferences

7   were correlated with regional variation in Medicare spending.  Ex. 10, Laurence C.

8   Baker, M. Kate Bundorf & Daniel P. Kessler, *Patients' Preferences Explain a*

9   *Small but Significant Share of Regional Variation in Medicare Spending*, 33 Health

10  Aff. 957 (June 2014).  In that study, Dr. Kessler controlled for the patient's "self-

11  reported health status"—a metric for injury severity.  *Id*. at 959.  Dr. Kessler did so

12  because he wanted to "hold[] constant other factors that would have the potential to

13  affect Medicare spending."  Ex. 2, Kessler Dep. 136:18-137:1.  Other articles Dr.

14  Kessler cited in his report included similar controls for injury severity in their

15  studies of variation in medical spending.  *See* Ex. 11, David Neumark, Peter S.

16  Barth & Richard A. Victor, *The Impact of Provider Choice on Workers'*

17  *Compensation Costs and Outcomes*, 61 Indus. & Lab. Rel. Rev. 121, 125 (Oct.

18  2007) (controlling for "[w]orkers' perceived severity" in study of whether provider

19  choice influences workers' compensation costs).

20        Dr. Kessler's methodology for inferring fraud or abuse in this case "is

21  unreliable, because it ignores the rigorous standards and methodology [Dr. Kessler]

22  himself applies [in] other studies."  *In re Silicone Gel Breast Implants Prods. Liab.*

23  *Litig.*, 318 F. Supp. 2d 879, 898 (C.D. Cal. 2004).  His opinion in this case has the

24  hallmark of an unreliable made-for-litigation opinion rather than sound social

25  science.  *See Lust By & Through Lust v. Merrell Dow Pharm., Inc.*, 89 F.3d 594,

26  597 (9th Cir. 1996) ("One very significant fact [in determining admissibility] is

27  whether the expert has developed his opinions expressly for purposes of testifying"

28  and "failed to subject his method to peer-review." (internal quotation marks and

1    citation omitted)).

2    **B.    Dr. Kessler Admits He Cannot Rule Out That Unobserved**
     **Differences in Severity Explain the Difference in Medical**
3    **Payments**

4         Rather than including a variable in his regression model to control directly

5    for injury severity, Dr. Kessler performs a separate analysis to investigate the

6    hypothesis that the difference in spending was the product of more severe injuries.

7    However, his method lacks any support in the literature, and simply begs the

8    question he attempts to answer.  For that reason, and as Dr. Kessler himself admits,

9    he cannot rule out that the differences he observed reflected different medical needs

10   by the patients rather than fraud or abuse.  Ex. 2, Kessler Dep. 90:5-21, 97:20-

11   99:17, 161:22-162:7, 185:15-25.

12        First, Dr. Kessler re-ran his analysis after separating out claimants "who

13   received and did not receive Indemnity payments."  Ex. 1, Kessler Report ¶ 23.

14   Indemnity payments "are payments for income replacement due to temporary

15   disability, permanent disability, or death."  *Id*. at 1 n.1.  Dr. Kessler observes that

16   "[a]mong Case and Comparison Claimants with Indemnity payments, Spending on

17   Case Claimants was 162% more than Spending on Comparison Claimants."  *Id*. at ¶

18   24.  This, he asserts, is "very strong evidence" that the spending difference is not

19   due to differences in injury severity.  *Id*.

20        But this metric is fatally flawed.  Dr. Kessler cites no literature stating that

21   analysis of indemnity payments can provide a reliable basis to rule out differences

22   in injury severity between patient populations.  In his deposition, Dr. Kessler

23   acknowledged that his "Indemnity Payment" category encompasses a wide range of

24   patients, from those who received a few days of temporary disability to those who

25   suffered permanent disability or even death.  Ex. 2, Kessler Dep. 104:20-105:4.

26   Thus, the difference in spending among those with Indemnity payments could

27   merely reflect the very thing Kessler attempts to disprove: that the Zaks

28   Defendants' patient population was more severely injured.

Second, Dr. Kessler asserts that the Defendants had a higher share of "Migratory Claims," which he identifies as a "hallmark[] of providers who abuse the workers' compensation system." Ex. 1, Kessler Report ¶ 26.  He defines migratory claims as "those with an apparently minor injury that transition to a period of long disability and high Indemnity cost." *Id*.  To measure migratory claims, Dr. Kessler "calculated the proportion of claimants with temporary disability who were ultimately were classified as having a permanent disability." *Id*.  Dr. Kessler asserts that Case Claimants were twice as likely as Comparison Claimants to have temporary disability migrate to permanent disability.  *Id*. at ¶ 27.

There are two glaring problems with this metric as well.  First, as a matter of logic, the fact that Case Claimants were far more likely to end up permanently disabled provides strong evidence that Case Claimants' injuries *were in fact more severe*.  While Dr. Kessler apparently believes this fact proves fraud or abuse, he cites no studies to that effect, and fails to explain why it is not equally (or more) consistent with greater severity of injury.

Relatedly, Dr. Kessler's metric for "migratory claims" is at odds with the very definition used in the study upon which he relies.  In that study, the authors define "migratory claims" as those in which the insurance carrier set aside an initial reserve for the claim of less than $15,000, but the final cost of medical treatment exceeded $50,000. Ex. 12, Edward J. Bernacki, Xuguang Tao & Larry Yuseph, *The Impact of Cost Intensive Physicians on Workers' Compensation*, 52 J. Occupational & Envt'l Med. 22, 23 (Jan. 2010).  The initial reserve is the amount that an insurance company initially sets aside for payment of the claim, and "serves as an estimate of the injury severity by the representative." *Id*. at 22.  The study's authors were careful to link the definition of "migratory claims" to this metric of injury severity in order to rule out the possibility that the study was simply identifying physicians who "treat[ed] individuals with more complicated injuries that required more sophisticated medical treatment and resulted in longer

disability." *Id*. at 25.  By contrast, Dr. Kessler's metric for "migratory claims" in this case includes no initial estimate of the claim's severity.

Consequently, Dr. Kessler admits that, even after conducting these ancillary inquiries, he "can't rule out that differences in spending between the Case and Comparison Claimants might be explained by differences in the severity of injuries between the two groups" rather than by the Defendants' conduct.  Ex. 2, Kessler Dep. 90:5-21; *see also id.* 97:20-99:17, 161:22-162:7, 185:15-25.  Rather, Dr. Kessler simply *assumes* the causal connection he attempts to disprove.  In light of his admitted failure to rule out the most obvious alternative explanation for his data in any scientifically rigorous manner, Dr. Kessler's opinion should be excluded. *Clausen*, 339 F.3d at 1058; *see also* Federal Judicial Center, *Reference Manual on Scientific Evidence* 221 ("observational studies provide good evidence" when, among other things, "[t]he association holds when effects of confounding variables are taken into account by appropriate methods.").

### C.   Dr. Kessler's Opinion That Differences in Injury Severity Are "Implausible" Is Unreliable

Bereft of any rigorous scientific analysis to rule out that differences in injury severity explains the differences in medical spending between Case and Comparison Claimants, Dr. Kessler repeatedly asserted that he simply did not find that alternative explanation "plausible."  Ex. 2, Kessler Dep. 90:5-21; *see also id.* 97:20-99:17, 161:22-162:7, 185:15-25.  But Dr. Kessler's bare assertion that systemic differences between the Case and Comparison Claimants are "implausible" is not a reliable expert opinion.

*First*, Dr. Kessler's judgment as to the "plausibility" of the alternative explanation amounts to nothing more than a "subjective belief or unsupported speculation."  *Daubert v. Merrell Dow Pharm.*, 509 U.S. 579, 590 (1993).  It is not the product of any reliable methodology, falsifiable hypothesis testing, or peer-reviewed research.

*Second*, Dr. Kessler's "plausibility" opinion is entirely question-begging. Dr. Kessler points to the observed difference in medical spending as "evidence" against the hypothesis that Case Claimants had greater medical needs than Comparison Claimants. But if Case Claimants were treating a patient population with systematically more severe injuries, such a difference is precisely what one would expect to observe.

*Third*, the low R-squared value for Dr. Kessler's regression model makes his casual dismissal of the "unobserved severity" hypothesis highly suspect. The R-squared number for a regression model "is the share of the variance in the dependent variable" (here, medical spending) "that's explained by the independent variables" in the model (such as age, gender, and whether the patient is a Case or Comparison Claimant). Ex. 2, Kessler Dep. 90:22-91:4. Although a low R-squared value does not alone render a regression analysis unreliable, "[a] very low R-squared ($R^2$) is one indication of an unexplained portion of the multiple regression model that is unacceptably high." Federal Judicial Center, *Reference Manual on Scientific Evidence* 314 n.31. In this case, Dr. Kessler's R-squared value was .0675. Kessler Dep. 95:14-20. That means that all of the independent variables in Dr. Kessler's model—including whether or not the patient was treated by Defendants—***collectively explain just 6.75% of the variation in medical costs between patients***. Ex. 2, Kessler Dep. 96:12-20. His model leaves a staggering ***93% of the variation in medical spending unexplained.*** *Id.* 96:21-24. Dr. Kessler acknowledges that he cannot "rule out the possibility that some factor like severity," for which he did not control, might explain a larger share of this variation in spending and also correlate with being a Case Claimant. *Id.* 97:20-99:17.

*Finally*, information contained in Dr. Kessler's own data casts serious doubt on his bare assertion that differences in severity of the patient populations cannot plausibly explain the difference in medical spending. Defendants' expert, Dr. Laurentius Marais, catalogued some of the obvious differences between Case and

Comparison Claimants for which Dr. Kessler did not account.  By way of example, while the average Comparison Claimant received just 21 *total* days of medical treatment, the average Case Claimant received 70 days of medical treatment for their injuries *before the patient began receiving care from the Defendants*.  Ex. 13, Expert Report of Laurentius Marais ("Marais Report") ¶¶ 24-26 & Tables 3-4. Similarly, attorneys were involved in the claims of 93 percent of Case Claimants, compared to just 18 percent of Comparison Claimants.  *Id.* at ¶ 33.  That is a powerful potential indicator of injury severity or complexity: A study by one of the authors cited by Dr. Kessler finds that attorney involvement is strongly correlated with higher per-patient medical spending and longer claim duration.  Ex. 14, Edward J. Bernacki & Xuguang Tao, *The Relationship Between Attorney Involvement, Claim Duration, and Workers' Compensation Costs*, 50 J. Occupational & Envt'l Med. 1013 (Sept. 2008).  And while just 13 percent of Comparison Claimants received an MRI at *any point* during their treatment, 28 percent of Case Claimants received an MRI for their injuries prior to being treated by the Defendants.  Ex. 13, Marais Report ¶ 34.  For purposes of this motion, the point of this recitation is not to engage in a battle of the experts or to prove definitively that more severe injuries, rather than the Defendants' conduct, caused the Case Claimants' higher treatment costs.  It is merely to show that Dr. Kessler's own data contains many facts facially inconsistent with his perfunctory dismissal of the possibility that the two patient populations had systematically different medical needs.

## II.   Dr. Kessler's Opinion That Defendants' Conduct Caused Higher Spending By Non-Defendant Doctors Is Unreliable and Should Be Excluded

As discussed above, *see supra* at 4-5, Dr. Kessler opines that the Defendants are liable not just for the higher bills that SCIF paid to the Defendants in connection with the Case Claimants, but also for SCIF's medical payments to *non-Defendant* medical providers incurred during the treatment window.  This opinion is unreliable

and speculative, and should be excluded.

Dr. Kessler acknowledged that non-Defendant doctors "have their own professional responsibility to provide appropriate treatment to patients," and that the Defendants could not dictate the treatment decisions of non-Defendant providers.  Ex. 2, Kessler Dep. 206:3-25.  Although he argued that the Defendants' conduct likely had *some* effect on the treatment decisions of non-Defendant providers, he acknowledged that he was not able to "quantify what percentage of payments going to non-[D]efendant providers within the treatment window was attributable to the conduct of [D]efendants." *Id*. 210:14-25.  He admitted that "there's no way to divide up payments" during the Defendants' treatment window "into those that are . . . necessarily independent or necessarily . . . caused by [D]efendants." *Id*. 208:10-209:3.

"As a general rule, damages which result from a tort must be established with reasonable certainty." *Lindy Pen Co. v. Bic Pen Corp.*, 982 F.2d 1400, 1407 (9th Cir. 1993), *superseded by statute on other grounds*.  Although damages need not "be calculated with absolute exactness . . . a reasonable basis for computation must exist." *Id*.; *see also Wecosign, Inc. v. IFG Holdings, Inc.*, 845 F. Supp. 2d 1072, 1084 (C.D. Cal. 2012).  Dr. Kessler admits that he has no reasonable basis for computing the portion of non-Defendant medical payments that are attributable to Defendants' conduct, and therefore simply speculates that the Defendants are responsible for *all* of those damages.  That speculative opinion is not admissible expert testimony.  *See* Fed. R. Evid. 702 advisory committee's notes, 2000 Amendments (expert testimony must be "properly grounded, well-reasoned, and not speculative before it can be admitted.").

## III. Dr. Kessler's Opinion That Defendants Provided "Inappropriate Medical Care" Is Unreliable and Unsupported By Relevant Expertise

Dr. Kessler admits that he is not "an expert in the practice of medicine," and that he lacks "any expertise in determining for any particular patient what is

1   medically necessary or an appropriate course of treatment." Ex. 2, Kessler Dep.

2   21:16-18, 23:19-24:4. Despite this admission, Dr. Kessler opines that "Defendants

3   provided inappropriate medical care to Case Claimants." Ex. 1, Kessler Report ¶ 3.

4   That opinion is unreliable and unsupported by any relevant expertise.

5   Dr. Kessler admitted that he did not "have any information on patient health

6   outcomes in this case," and "was not able to obtain reliable data on the health

7   outcomes of the particular patients." Ex. 2, Kessler Dep. 184:14-185:3. However,

8   as Dr. Kessler has previously written, "without information on [patient] outcomes,

9   classification of a pattern of treatment as abusive is necessarily speculative,"

10   because there is no basis for determining whether the services provided were

11   medically necessary. Ex. 9, *Detecting Medicare Abuse*, at 10. For that reason

12   alone, Dr. Kessler's opinion that Defendants provided inappropriate medical care

13   constitutes inadmissible speculation.

14   Instead of measuring patient outcomes directly, Dr. Kessler's opinion is

15   based on his measurement of several variables that *correlate* with poor health

16   outcomes—a higher percentage of high-cost treatment (such as surgery), longer

17   claim duration, reduced continuity of care, and a larger number of medical

18   providers. *See supra* at 6-7. However, Dr. Kessler cites no literature stating that

19   one can infer the existence of inappropriate medical care merely by pointing to

20   variables that may correlate with poor patient health outcomes.

21   His methodology is plainly unreliable, because all of these ostensible

22   "proxies" for poor quality care also correlate with more severe injuries. As Dr.

23   Kessler admits, patients with more severe injuries may require more intensive and

24   expensive treatments, Ex. 2, Kessler Dep. 169:11-170:2, may have longer recovery

25   times, *id.* 224:8-10, and may require a larger number of care providers due to the

26   need for specialist referrals, *id.* 228:21-229:11; 230:15-231:16. Thus, while any of

27   these variables *could* indicate that Defendants provided poor-quality medical care,

28   they could just as easily indicate that the Case Claimants suffered from

systematically more severe injuries which called for more intensive treatment.

The published literature—including the very literature on which Dr. Kessler relies—makes clear that, without information on the initial severity of the injury, a correlation between provider conduct and poor patient health outcomes does not prove the former caused the latter.  In one study cited by Dr. Kessler, the authors sought to measure whether discontinuity of care resulted in poorer health outcomes. Ex. 15, Carl van Walraven, Natalie Oake, Alison Jennings & Alan J. Forster, *The Association Between Continuity of Care and Outcomes*, 16 J. of Evaluation in Clinical Prac. 947 (2010).  The authors cautioned that "[a]dverse health outcomes will usually decrease [continuity of care] as patients who experience poor outcomes frequently need to involve new doctors in their care." *Id*. at 948.  Consequently "[w]ithout appropriate analytical techniques, studies that concurrently measure continuity and outcomes may incorrectly conclude that 'discontinuity' caused poor health outcomes when, in fact, the opposite was true." *Id*.  The authors found it "highly concerning" that some prior studies had not taken this problem into account, and concluded that reliable studies should compare patient health metrics *before and after* the discontinuity of care in order to accurately infer causation.  *Id*. at 954-55.

Dr. Kessler has committed precisely the same error in this case.  Without measuring the initial severity of the patients' injuries, Dr. Kessler has no basis to conclude that poor patient health was the *result*, rather than the *cause*, of Defendants' medical treatment decisions.  His opinion is thus unreliable and should be excluded.

**IV.  Dr. Kessler's Opinion That Defendants' Conduct Caused Higher Medical Spending by SCIF on Comprehensive Patients Is Unreliable and Should Be Excluded**

Dr. Kessler's opinion that Defendants' conduct caused higher spending on patients at Comprehensive is based on the same basic methodology as his principal regression analysis.  It is therefore unreliable and inadmissible for all of the same

reasons.  *See supra* at 11-19.

However, for several reasons, his Comprehensive opinion is even less reliable than his principal opinion.  *First* Dr. Kessler did not perform even the perfunctory and flawed analysis of Indemnity Payments and Migratory Claims that he uses to infer fraud in his analysis of the other Zaks Entities.  *Compare* Ex. 1, Kessler Report ¶¶ 22-26 *with* ¶¶ 53-56.  *Second*, he fails to engage in any analysis of treatment patterns or of care quality for Comprehensive's patients, despite recognizing that Comprehensive Claimants' "treatment patterns differ materially from Case Claimants'."  *Id*. at ¶ 53, Ex. 2, Kessler Dep. 233:13-19, 235:6-236:7.  As Dr. Kessler has previously written, "without information on outcomes, classification of a pattern of treatment as abusive *is necessarily speculative*."  Ex. 9, *Detecting Medicare Abuse*, at 10 (emphasis added).  *Third*, even though Comprehensive is a surgery center whose patients are specifically referred there for surgery, Dr. Kessler made no effort to ensure that his supposed "Comparison Claimants" consisted only of those patients who received surgery.  Ex. 2, Kessler Dep. 239:16-23.  This creates a significant and obvious selection bias.  *Finally*, none of the doctors who performed surgery at Comprehensive were in any way affiliated with the Zaks Defendants—rather, they were third-party doctors who merely paid a fee to Comprehensive in exchange for use of the facility.  *See* Ex. 3, March 29, 2013 Decl. of Alexander Zaks in Supp. of Anti-SLAPP Mot., ¶ 17.  In light of that fact, Dr. Kessler's attribution of these payments to conduct by Defendants is pure speculation.

## V.   Dr. Kessler's Rebuttal Opinion That the Settlement in This Case Was the Product of Fraud Is Unreliable and Unsupported By Relevant Expertise

Finally, Dr. Kessler offers a rebuttal opinion that the settlement agreements in this case were the product of fraud.  *See supra* at 8-10.  To support that opinion, Dr. Kessler looks at the ratio of the settlement amount in this case to the amount of SCIF's potential liability.  He then claims that, because the settlement-to-amount-

due ratio in this case is higher than the average 29% ratio paid by SCIF in supposedly comparable lien settlements, the settlements in this case were fraudulent.  That opinion is unsupported by any relevant expertise and is unreliable.

*First*, Dr. Kessler has not disclosed any expertise that would qualify him to opine on whether the settlement agreement was fraudulently induced.  In his report, Dr. Kessler invokes his "experience analyzing health care claims data and [his] background in law and economics."  Ex. 7, Kessler Rebuttal Report ¶ 10.  But it is not enough to show that an expert is qualified "in the abstract"; SCIF must show that "those qualifications provide a foundation for a witness to answer [the] specific question" on which the expert is asked to opine.  *Berry v. City of Detroit*, 25 F.3d 1342, 1351 (6th Cir. 1994).

Dr. Kessler's report nowhere explains how Dr. Kessler's general experience in the field of health care economics bears on the question of whether a settlement agreement was the product of collusion.  Moreover, Dr. Kessler admitted that he was "not an expert in the settlement of liens in workers' compensation."  Ex. 2, Kessler Dep. 244:5-17.  When pressed to name what factors "drive settlement numbers," Dr. Kessler stated that other than "the amount due on the liens," he "wouldn't know" the factors that drive parties' decisions because he is not an expert in settlement negotiation.  *Id*.  Given this lack of basic knowledge about the factors that influence settlement negotiations, Dr. Kessler is not qualified to opine on whether the settlement amount in this case is indicative of fraud or collusion.

*Second*, even if Dr. Kessler were qualified to offer his opinion, that opinion is not the product of reliable principles and methods.  Dr. Kessler's entire opinion hinges on whether his supposedly "comparable lien settlements" are in fact comparable.  But even though this is the lynchpin of his analysis, Dr. Kessler admittedly performed *no* "investigat[ion of] the facts and circumstances" of these other cases to see whether they "had similar facts and circumstances to the settlement of the case claims here."  *Id*. 243:8-17, 245:3-9.  For instance, while this

case had been heavily litigated for well over three years before it settled, Dr. Kessler did not know how many (if any) of his "comparison" cases "involved litigation involving lawyers." *Id*. 243:18-24.  Moreover, although Judge Siemers had issued several decisions adverse to SCIF prior to the settlement of this case, Dr. Kessler did not know how many (if any) of his "comparison" cases involved merits rulings adverse to SCIF.  *Id*. 243:25-244:4.  Additionally, the claims in this case originated between 2002 and 2005, and so had accrued the statutorily-mandated interest for between four and seven years when the case was first settled in 2009. *See* Cal. Lab. Code § 4603.2.  Dr. Kessler's report provides no data on how long any of his supposedly "comparable" claims had been outstanding, and so does not ensure that they involved similar liability for accrued interest.[6]

Thus, Dr. Kessler has no basis to believe that the supposedly "comparable" lien claims were meaningfully similar to the claims in this case, either in terms of SCIF's potential exposure or of SCIF's probability of success in litigation.  Without any such analysis, it is pure speculation for Dr. Kessler to conclude that the higher ratio of settlement-to-amount due in this case indicates fraud.

## CONCLUSION

For these reasons, Dr. Kessler's opinions do not meet the reliability standards set forth in Federal Rule of Evidence 702 and should be excluded.

---

[6] Dr. Kessler simply excludes interest from his principal calculation altogether, based on an alleged statement by a SCIF employee (whose name he cannot remember) that "while settlements are evaluated on a case-by-case basis, generally interest and penalties do not materially impact State Fund's settlement analysis."[6] Ex. 7, Kessler Rebuttal Report ¶ 8 n.1; Ex. 2, Kessler Dep. 246:23-24.  But Dr. Kessler could not say under what circumstances SCIF *did* consider interest and penalties (though one would imagine a potential $10 million interest bill would be a relevant consideration), nor did he know whether SCIF in fact considered interest and penalties in this case.  Ex. 2, Kessler Dep. 246:25-247:8.

1

Dated:  February 29, 2016

2

Respectfully submitted,

3

/s/ Glen E. Summers
**BARTLIT BECK HERMAN PALENCHAR &**
**SCOTT LLP**

4

Glen E. Summers
Karma M. Giulianelli

5

1899 Wynkoop Street, 8th Floor
Denver, CO 80202

6

Telephone:   (303) 592-3100
Facsimile:    (303) 592-3140

7

8

**MURPHY ROSEN LLP**
Paul D. Murphy

9

Mark J. Nagle
100 Wilshire Boulevard, Suite 1300

10

Santa Monica, California 90401
Telephone: (310) 899-3300

11

Facsimile:   (310) 399-7201

12

*Attorneys for the Zaks Defendants*

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## CERTIFICATE OF SERVICE

I hereby certify that on February 29, 2016, I electronically filed the foregoing **THE ZAKS DEFENDANTS' NOTICE OF MOTION, MOTION, AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO EXCLUDE EXPERT TESTIMONY OF DANIEL KESSLER** and attached exhibits with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses registered.

*/s/ Glen E. Summers*

4827-2871-6078, v. 2