# JS-6

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

## SOUTHERN DIVISION

|  |  |
|---|---|
| | ) Case No.: SACV 12-01072-CJC(JCGx) |
| | ) |
| | ) |
| **STATE COMPENSATION** | ) |
| **INSURANCE FUND, a Public** | ) |
| **Enterprise Fund and Independent** | ) |
| **Agency of the State of California,** | ) **ORDER GRANTING DEFENDANTS'** |
| | ) **MOTIONS FOR SUMMARY** |
| | ) **JUDGMENT** |
| **Plaintiff,** | ) |
| | ) |
| **v.** | ) |
| | ) |
| **SANA ULLAH KHAN, an individual, et** | ) |
| **al.,** | ) |
| | ) |
| | ) |
| **Defendants.** | ) |
| | ) |

## I.  INTRODUCTION

Plaintiff State Compensation Insurance Fund (State Fund) brought this action for violation of the federal Racketeering and Corrupt Organizations Act (RICO) statute, 18

U.S.C. § 1962(c), and for conspiracy to commit RICO, 18 U.S.C. § 1962(d), against defendants Alexander Zaks, M.D., Sana Khan, M.D., David Holmes, D.C., and Daniel Reyes, D.C.; their various companies (the "Zaks Entities"[1] and the "Khan Entities"[2]); and State Fund's own former employee, attorney Bruce Roth.  State Fund has also asserted a claim for fraud against Dr. Zaks and the Zaks Entities only.  After three years of litigation and extensive discovery, the Zaks Defendants, the Khan Defendants, and Roth have filed three separate motions for summary judgment.[3]  For the reasons discussed below, Defendants' motions for summary judgment are GRANTED.

## II.  BACKGROUND

In 2001, Dr. Zaks decided to form several businesses (the Zaks Entities) in California's Central Valley that focused on providing medical treatment to the region's agricultural workers.  (Dkt. 258, Zaks Defs.' Statement of Uncontroverted Facts (SUF) ¶ 1.)  Dr. Zaks, along with Drs. Holmes and Reyes, formed Accident Help Line Medical Group (AHL) at that time.  (SUF ¶ 2.)  AHL was staffed with doctors, chiropractors, and other medical professionals, and focused on patients with chronic work-related injuries and associated pain.  (Id.)  Dr. Zaks also established Millcreek Surgery Center and Alta Surgery Center, ambulatory surgery centers where doctors performed outpatient surgery procedures.  (SUF ¶ 2.)  Dr. Zaks and a partner also owned Reliable Medical Supply, which provided medical equipment to multiple medical providers, including AHL.  (SUF

---

[1] The Zaks Entities are comprised of defendants Accident Help Line Medical Group, Inc.; Alexander Zaks, M.D., Inc.; Alta Surgery Center Medical Clinic, Inc.; Technical Surgery Support Medical Clinic Services, Inc.; Reliable Medical Supply, LLC; Valley Interpreting Services, LLC; and Comprehensive Outpatient Surgery Center, LLC.

[2] The Khan Entities are comprised of Physicians Mobile Medical Group, Inc.; Precision Care Medical Group; True Imaging Medical Group; Windstar Medical Associates; Crescent Diagnostic Medical Group, Inc.; Crescent Comprehensive Management, Inc.; and Mobile Medical Imaging Xperts.

[3] The Zaks Entities together with Dr. Zaks, Dr. Holmes, and Dr. Reyes are the "Zaks Defendants" throughout.  The Khan Entities together with Dr. Khan are the "Khan Entities" throughout.

¶ 2.)  In 2003 Dr. Zaks and partners also created Valley Interpreting, a translation service for patients who spoke limited or no English.  (SUF ¶ 2.)

Dr. Khan owned the Khan Entities, which conducted diagnostic testing for AHL.  (Dkt. 298-1, State Fund's Compendium of Testimony (CT) Ex. 18 at 156:9-157:5.)  Dr. Khan and Dr. Zaks engaged in some cross marketing of their respective services to attorneys representing clients with workers' compensation issues.  (CT Ex. 18 at 95:5-24.)  Drs. Zaks and Khan also jointly trained AHL staff to follow certain treatment protocols, which required that particular treatments and diagnostic testing be ordered for all AHL patients.  (Dkt. 294, State Fund's Statement of Additional Material Facts (SF) #22.)

State Fund is the largest provider of workers' compensation insurance in California and was the carrier for a substantial percentage of AHL's patient claims, as well as other claims submitted by the Zaks Entities and Khan Entities.  (SUF ¶ 4.)  Beginning in 2002, State Fund began denying many of the claims the Zaks Entities and Khan Entities submitted to it.  (SUF ¶ 3.)  Following State Fund's nonpayment, the Zaks Entities and the Khan Entities filed claims (known as "liens") with the Workers Compensation Appeals Board (WCAB), which sought payment on the claims that State Fund had rejected.  (SF #74.)  From 2002 to 2005, the Zaks Entities filed over 1,200 liens seeking payment from State Fund.  (SUF ¶ 5.)

Defendant Bruce Roth, then a senior attorney with State Fund, was assigned to defend State Fund against the Zaks Entities' WCAB liens.  Suspecting possible fraud, Roth led an investigation of the Zaks Entities by no later than 2004.  (SUF ¶ 7.)  With State Fund's authorization, Roth made a criminal referral of the case to California's Department of Insurance (CDI).  (*Id.*)  Based on Roth's referral and other insurance companies' reports, CDI initiated a fraud investigation of AHL that it dubbed "Operation

Chicken." (Dkt. 300-1, Pl.'s Compendium of Exhibits (CE) Ex. 9.) CDI's investigation led to indictments of some AHL employees (none of whom are defendants in this case), but the indictments were eventually dismissed. (SUF ¶ 7.)

State Fund has introduced evidence that patients at AHL and other Zaks and Khan Entities received unnecessary medical tests that were not reflective of their individual medical conditions. (SF #31.) The evidence was generated largely through Roth's work and Operation Chicken, which among other things entailed sending undercover investigators (masquerading as patients) to AHL and interviewing people who had worked at AHL. Testimony in the record indicates that Dr. Zaks, the other owners of AHL, and Dr. Khan pressured AHL chiropractors and staff to meet quotas for treatments, tests, and services. (SF ##11, 33.) One chiropractor who worked at AHL in 2001 and 2002 listed numerous flaws he perceived in the treatment patients received there, and stated that the patients were moved through the treatment programs "like cattle." (Dkt. 299-7, Pl.'s Compendium of Declarations (CD) Ex. 16, ¶ 7 and Ex. A at 25.) An AHL patient expressed a similar sentiment, stating that "[b]eing a patient at Accident Helpline reminded [him] of going to Chuck E Cheese[']s where you put a quarter in the machine, ride the horse, and leave." (Dkt. 299-8, CD Ex. 23 ¶ 5.) Additional testimony indicates that Drs. Zaks, Holmes, and Reyes instructed AHL chiropractors and clinic staff to refer every patient to the Khan Entities for nerve conduction testing and MRIs, whether or not they were necessary. (SF #51-58.) State Fund has also presented other evidence from patients, employees, documents, and experts tending to suggest that various Zaks Entities and Khan Entities overbilled and provided substandard or unnecessary services from 2002 through 2006. (SF ##31-72.)

In January 2006, Roth filed a petition with the WCAB to consolidate (for the purpose of litigating common issues) the Khan Entities' and Zaks Entities' 1,200+ liens against State Fund. (Dkt. 300-2, CE Ex. 11.) State Fund's petition for consolidation

asserted wide-ranging allegations of "systemic" fraud by the Zaks Defendants and Khan Defendants as defenses to the lien claims.  (*Id.*)  Early on, the proceeding was ordered stayed with respect to the Khan Entities.  (SF #79.)  From 2006 to 2009, Roth represented State Fund against the Zaks Entities in the WCAB matter.  In 2007, the parties stipulated to resolve the WCAB matter in binding arbitration.  (SUF ¶ 11.)

In October 2009, after losing on several issues before the arbitrator,[4] Roth settled the consolidated case with the Zaks Defendants without first gaining the approval of his manager at State Fund or State Fund's claims department.  (SUF ¶ 19.)  Neither Roth's management nor State Fund's claims department had any indication that settlement was imminent: everyone at State Fund aside from Roth was under the impression that the case would continue to be litigated and that it would be appealed in the event of an unfavorable judgment.  (SF ##99-105.)  Once Roth's superiors at State Fund learned of the settlement (memorialized in the 2009 "Settlement Memorandum"), they removed Roth from the case, contacted the Zaks Entities, and disavowed the settlement on the basis that Roth lacked authority to enter into it.  (SUF ¶ 27.)

At this time, State Fund brought in outside counsel from the law firm Sonnenschein Nath & Rosenthal (now known as Dentons LLP) to litigate the enforceability of the Settlement Memorandum.  (*Id.*)  State Fund and Sonnenschein investigated the circumstances leading up to Roth's signing of the 2009 Settlement Memorandum.  (SUF ¶ 28.)  Roth was interviewed separately by his supervisor, by

---

[4] The parties sharply dispute the effect that these losses would have had on the WCAB arbitration, had it continued.  The Zaks Defendants take the position that the arbitrator's rulings severely undercut State Fund's case.  State Fund takes the position that it was poised to appeal the unfavorable rulings to the WCAB and that the issues most favorable to it remained undecided at the time Roth settled the case in October 2009.  (Dkt. 291, State Fund's Statement of Genuine Disputes in Support of Opposition to the Zaks Defendants' Motion ¶¶ 12-17.)  As this is the Zaks Defendants' motion for summary judgment, the Court will credit State Fund's position that its prospects of prevailing in the WCAB action were not as remote as the Zaks Defendants assert.

Sonnenschein attorneys, and by a second State Fund attorney.  (SUF ¶ 28.)  At State Fund's request, Roth provided written explanations of his actions.  (SUF ¶ 30.)  Roth indicated that he was "frustrated/depressed in the way the case was proceeding."  (*Id.*)  He also stated that the arbitrator "was going to find against [State Fund] on all issues" and would "award interest, penalties, and attorney's fees to the lien claimants."  (SUF ¶ 30.)[5]  Roth also indicated that "many of his witnesses would not testify because of the possibility of self-incrimination."  (Dkt. 291, SGD ¶ 30e.)

State Fund compelled Roth to resign in March 2010.  (SUF ¶ 35.)  In April 2010, with the help of outside counsel and without Roth's involvement, State Fund entered into superseding settlement agreements with the Zaks Entities (the 2010 "Settlement Agreements")[6] for substantially the same amount of money as provided for in the 2009 Settlement Memorandum.  (SUF ¶ 33.)  State Fund asserts that it did so in large part out of concern that the WCAB might have enforced the original 2009 Settlement Memorandum between Roth and the Zaks Entities based on Roth's ostensible authority to bind State Fund.  (SF ##144, 149.)  The 2010 Settlement Agreement between State Fund and the Zaks Entities released both State Fund and the Zaks Entities from all claims they had against each other up until the time of that agreement.  (Dkt. 300-9, CE Ex. 70, AHL Settlement Agreement at 2.)[7]  The 2010 Settlement Agreements were submitted to Chief Judge Kahn of the WCAB, who signed orders approving each of them and directing each of the Zaks Entities to remove its liens.  (SUF ¶ 41.)

---

[5] State Fund contests the accuracy of these statements and notes that they contradict earlier positive accounts of the litigation Roth gave to his colleagues, but acknowledges that Roth provided them as an explanation for his actions.  (Dkt. 291, Pl.'s Statement of Genuine Disputes in Support of Opposition to the Zaks Defendants' Motion for Summary Judgment (SGD) ¶ 30e.)

[6] Each Zaks Entity entered into its own separate agreement with State Fund.  (CE Exs. 70-77.)

[7] This citation is to language in the 2010 Settlement Agreement between State Fund and AHL.  (CE Ex. 70.)  The Settlement Agreements between State Fund and the other Zaks Entities all contain identical language.  (CE Exs. 71-77.)

Soon after the 2010 Settlement Agreements were signed (without Roth's involvement), Roth took a job with an entity named Global Holdings, Inc.  (SUF ¶ 42.) The owner of Global Holdings, Sam Solakyan, was friendly with both Drs. Zaks and Khan, and Dr. Khan was the Chief Medical Officer of Global Holdings at the time.  (SF ##132, 134, 175.)  Before learning of Roth's new employment, State Fund believed that Roth had made a "colossal error" by entering into the Settlement Memorandum, but not that he had committed fraud.  (SF #168.)  After learning that Dr. Khan also worked for Roth's new employer, however, State Fund informed CDI of the situation and launched a fraud investigation concerning Roth's decision to settle the Zaks Entities' lien claims. (SF ##179-80.)  In April 2011, State Fund was notified that CDI was actively investigating the matter with the FBI for a possible criminal prosecution.  (SF #181.) There is no indication in the record that any criminal charges were ever filed as a result of that investigation.

In 2012, State Fund filed the instant lawsuit, which asserts a course of RICO activity against the Defendants, starting with the allegedly fraudulent medical claims submitted to State Fund as early as 2002, running through the alleged quid pro quo concerning Roth, and including an August 2011 lawsuit—which has since been dismissed—that the Khan Entities filed against State Fund to assert claims State Fund contends had already been sold to a third party collection company.  (SF #185-86.)

## III.  LEGAL STANDARD

The Court may grant summary judgment on "each claim or defense—or the part of each claim or defense—on which summary judgment is sought."  Fed. R. Civ. P. 56(a). Summary judgment is proper where the pleadings, the discovery and disclosure materials on file, and any affidavits show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  *Id.*; *see also Celotex Corp. v.*

*Catrett*, 477 U.S. 317, 322 (1986).  The party seeking summary judgment bears the initial burden of demonstrating the absence of a genuine issue of material fact.  *Celotex Corp.*, 477 U.S. at 325.  A factual issue is "genuine" when there is sufficient evidence such that a reasonable trier of fact could resolve the issue in the nonmovant's favor.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A fact is "material" when its resolution might affect the outcome of the suit under the governing law.  *Id.*  "Factual disputes that are irrelevant or unnecessary will not be counted."  *Id.* at 249.

Where—as here—the nonmovant will have the burden of proof on an issue at trial, the moving party may discharge its burden of production by either (1) negating an essential element of the opposing party's claim or defense, *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158-60 (1970), or (2) showing that there is an absence of evidence to support the nonmoving party's case, *Celotex Corp.*, 477 U.S. at 325.  Once this burden is met, the party resisting the motion must set forth, by affidavit, or as otherwise provided under Rule 56, "specific facts showing that there is a genuine issue for trial."  *Anderson*, 477 U.S. at 256.  A party opposing summary judgment must support its assertion that a material fact is genuinely disputed by (i) citing to materials in the record, (ii) showing the moving party's materials are inadequate to establish an absence of genuine dispute, or (iii) showing that the moving party lacks admissible evidence to support its factual position.  Fed. R. Civ. P. 56(c)(1)(A)-(B).  But the opposing party must show more than the "mere existence of a scintilla of evidence"; rather, "there must be evidence on which the jury could reasonably find for the [opposing party]."  *Anderson*, 477 U.S. at 252.

In considering a motion for summary judgment, the court must examine all the evidence in the light most favorable to the non-moving party, and draw all justifiable inferences in its favor.  *Id.* at 285.  But "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for

trial" and summary judgment should be granted.  *Matsushita Elec. Indus, Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal quotation marks omitted).

## IV.  ANALYSIS

### A.  The Zaks Defendants' Motion for Summary Judgment

State Fund has presented a substantial amount of evidence in support of its allegations that the Zaks Entities performed unnecessary medical procedures and engaged in billing fraud between 2002 and 2006.  Nonetheless, that alleged fraud is not the central issue here.  State Fund—already in possession of that same evidence—entered into the 2010 Settlement Agreements, which unequivocally released all claims arising out of those procedures and billings.  Accordingly, the central issue before the Court is *not* the possible underlying merit of those fraud claims, but rather whether the Zaks Entities and Roth committed any act of fraud with respect to the 2010 Settlement Agreements that would undo and rescind State Fund's release of those claims.  State Fund entered into the new 2010 Settlement Agreements with the Zaks Defendants six months after repudiating the 2009 Settlement Memorandum.  The full text of the Settlement Agreements' release states:

### RELEASE OF CLAIM BY PARTIES

Except for the liabilities and obligations arising out of this Agreement, the Lien Claimants and State Fund, and each of them, hereby release and forever discharge one another along with along with [sic] their respective officers, directors, managers, members, employees, agents, attorneys, and insurers, from any and all claims, demands, actions, liabilities, obligations, accounts, expenses, attorneys' fees, and causes of action of every kind and nature, in law, in equity, or otherwise, whether known or unknown, which State Fund

now have or may have had against the Lien Claimants or which the Lien Claimants now have or ever had against State Fund arising out of the Compromised Claims or which, or which [sic] may hereafter accrue.

(CE Ex. 70 at 2.)

The Zaks Defendants argue that the civil RICO claims and state fraud claim alleged against them in this litigation must be dismissed because both were covered by this broad release.  State Fund counters with two arguments about why the release in the Settlement Agreements does not bar the claims outright.  First, State Fund argues that even if the release is enforceable for claims against the "Lien Claimants"—the Zaks Entities with lien claims against State Fund—it is by its own terms not enforceable for claims against the Zaks Defendants who are *individuals*.  Second, State Fund argues that the 2010 Settlement Agreements are in their entirety subject to rescission because they were obtained through the Zaks Defendants' fraud in violation of the agreements' "no fraud" clause.[8]  Neither argument is persuasive.

## 1.  The Applicability of the Release in the 2010 Settlement Agreements to Individual Zaks Defendants

State Fund does not dispute that the Settlement Agreements' release, if enforceable, would bar the civil RICO claims and the fraud claim against the Zaks Entities.  State Fund does *not*, however, concede that the release in the Settlement Agreements releases Dr. Zaks and his partners, Dr. Reyes and Dr. Holmes (the "Individual Zaks Defendants") from those claims.  State Fund argues that absent the

---

[8] The 2010 Settlement Agreements include a warranty that the parties "were not aware of any duress, menace, fraud, coercion, or undue influence which has caused any Party to enter into this Agreement." (Dkt. 300-9, CE Ex. 70, AHL Settlement Agreement at 2.)

releases, the Individual Zaks Defendants would be subject to liability for the claims at issue here in two capacities: (1) as owners, officers, and directors of the Zaks Entities (their "derivative liability"), and (2) in an individual capacity for their own personal conduct in defrauding State Fund or causing it financial harm through violations of the RICO statute (their "individual liability").  The language of the release—according to State Fund—pertains only to derivative liability, not individual liability.

State Fund argues that though the release includes the Zaks Entities' "respective officers, directors, managers, members, employees, agents, attorneys, and insurers," it only releases them from "any and all claims . . . which State Fund now ha[s] or may have had *against the Lien Claimants* arising out of Compromised Claims."  (CE Ex. 70 at 2 (emphasis added).)  The Lien Claimants, as defined by the Settlement Agreements, are the Zaks Entities, not the Individual Zaks Defendants.  (*See, e.g.,* CE Ex. 70 at 1.)  And—the argument goes—because the releases only release the Zaks Defendants from claims that State Fund had "against the Lien Claimants" (that is, against the Zaks *Entities*), State Fund did not release its claims against the Individual Zaks Defendants brought against them in their individual capacities rather than derivative to claims against the Zaks Entities.

Contractual releases operate by the same principles as any other contractual agreement.  *Marder v. Lopez*, 450 F.3d 445, 449 (9th Cir. 2006).  Interpretation of a contract, including a release, is governed by the language of the contract "if the language is clear and explicit, and does not involve an absurdity."  *See* Cal. Civ. Code. § 1638; *Rodriguez v. Oto*, 212 Cal. App. 4th 1020, 1027-28 (2013).

Here, the language of the release is clear and supports the Zaks Defendants' position that the release applies to both the Zaks Entities and to the Individual Zaks Defendants for any acts undertaken in their capacities as agents of the Zaks Entities.  The

release clause in the Settlement Agreements releases the Zaks Entities—"Lien Claimants," in the language of the release—and "**their respective officers, directors, managers, members, employees, agents, attorneys, and insurers from any and all claims** . . . which State Fund now has or may have had against the Lien Claimants." (emphasis added)  In this case, State Fund is bringing the same civil RICO claims and fraud claim against *both* the Zaks Entities and the Individual Zaks Defendants.  Those claims are therefore undeniably claims that State Fund "may have had against the Lien Claimants."  Accordingly, the plain language of the release releases *both* the Lien Claimants and the Individual Zaks Defendants (because they are officers, employees, and agents of the Lien Claimants) from the claims.  State Fund's argument is a nonstarter.

State Fund's preferred reading also defies common sense: it leads to the absurd result of Dr. Zaks accepting a release of the Zaks Entities' potential liability for the allegedly fraudulent liens before the WCAB, while leaving open the possibility that he and the other Individual Zaks Defendants could later be sued and held liable for their actions concerning those same liens, which they filed on the Zaks Entities' behalf.  This result would have left Dr. Zaks himself and the other individuals exposed to millions of dollars in liability in the event they lost a subsequent lawsuit brought by State Fund.  Dr. Zaks would have obtained no peace of mind by accepting such a settlement, nor as a practical matter would the Zaks Entities.  If State Fund did file a suit against the Individual Zaks Defendants based on the liens they filed on behalf of the Zaks Entities, the Zaks Entities would have to indemnify the Individual Zaks Defendants for their legal fees and costs in the event the Individual Zaks Defendants prevailed in the suit.  *See Cal. Corp. Code* § 317(d).  Even should the Individual Zaks Defendants lose that suit, the Zaks Entities might nonetheless be required to indemnify them against the judgment.  *See id.* §§ 317(e) and (g).  The Zaks Entities themselves would therefore receive very little protection under State Fund's interpretation of the release.  Indeed, the benefits of the release would be illusory from the Zaks Defendants' standpoint.  But parties routinely

negotiate releases that include releases for their agents in order to avoid this potential

liability.  And that is exactly what Dr. Zaks did here for himself and the other Individual

Zaks Defendants.  Despite State Fund's urging to do so, it is not the Court's place to

rewrite the terms of a release.  If the language of the release does not comport with State

Fund's preferred result, State Fund has no one to blame but itself.  It never should have

agreed to the broad coverage of the release.  In any event, the Court will not force the

Zaks Defendants to accept a deal they did not—and never would—make.  Simply stated,

the release covers claims against all the Zaks Defendants, both the entities and the

individuals.[9]

## 2.  State Fund's Allegations of Fraud

In its argument for rescission of the 2010 Settlement Agreements, State Fund

advances three distinct theories of how the Zaks Defendants violated the Settlement

Agreements' "no fraud" clause: (1) that the underlying liens at issue in the WCAB

litigation were the product of the fraudulent scheme they devised and executed; (2) that

Dr. Zaks colluded with Roth to defraud State Fund in connection with the 2009

Settlement Memorandum, and that the Settlement Memorandum drove State Fund to

enter the 2010 Settlement Agreements; and (3) that the Zaks Defendants connived to take

advantage of State Fund when they sought to enforce the Settlement Memorandum while

knowing that Roth signed it without State Fund's consent and against its wishes.  (Pl.'s

---

[9] Though State Fund argues to the contrary, the Zaks Defendants' preferred reading of the release takes
into account the limiting language "against the Lien Claimants" because it ensures that the release will
only apply to the conduct of the Individual Zaks Defendants while they were acting within the scope of
their agency, as any tort committed by any of them outside the scope of their agency could not be
imputed to a Lien Claimant.  In this case, the alleged acts of fraud committed by the Individual Zaks
Defendants would fall well within the scope of their agency, as those acts were done in furtherance of
the fraudulent billing and settlements that increased the Lien Claimants' earnings.

Opp'n Br. at 61.)[10]  A close look at the relevant law and evidence in the record, however, indicates that a reasonable jury could not find in State Fund's favor under any of the three theories.

### a.  Fraud in the Underlying Lien Claims

State Fund's argument that rescission is warranted based on fraud in connection with the underlying lien claims themselves fails as a matter of law.  Here, the WCAB entered judgment on State Fund's claims when it approved the 2010 Settlement Agreements.  Despite State Fund's assertions to the contrary, under California law, a court may only rescind a judgment based on fraud when that fraud is extrinsic to the subject matter of the contract—that is, when the fraud pertains to something outside the contract that plays a part in inducing a party to enter into it.  *See Eichman v. Fotomat Corp.*, 147 Cal. App. 3d 1170, 1175 (1983) ("Fraud by a party will not undermine the conclusiveness of a judgment unless the fraud was extrinsic, i.e., it deprived the opposing party of the opportunity to appear and present his case.")  Examples of extrinsic fraud include "failure to give notice of the action to the other party," or "convincing the other party not to obtain counsel because the matter will not proceed (and it does proceed)." *Heyman v. Franchise Mortgage Acceptance Corp.*, 107 Cal. App. 4th 921, 926 (2003). Fraud is intrinsic, on the other hand, "when the party has been given notice of the action and has had an opportunity to present his case and to protect himself from any mistake or fraud of his adversary, but has unreasonably neglected to do so." *Id.*  "Such a claim of fraud goes to the merits of the prior proceeding which the moving party should have guarded against at the time." *Id.*  Here, the liens are intrinsic to the 2010 Settlement Agreements—they were the very thing being settled.  Under California law, therefore,

---

[10] State Fund's briefing asserts a fourth category of fraud, which concerns the alleged quid pro quo between Dr. Zaks and Roth, but the Court believes this falls squarely within (2), which concerns alleged collusion between Zaks and Roth.  At oral argument, State Fund acknowledged that these two assertions collapse into each other.

fraud underlying or intrinsic to the lien claims themselves provides no basis for rescinding the Settlement Agreements and the WCAB judgment resulting from them.

State Fund asserts, however, that the rules for workers' compensation judgments are different.  For support, State Fund cites *Johnson v. Workmen's Comp. Appeals Bd.*, which states that "[u]nlike the rule as to judgments, intrinsic fraud or mistake will suffice to set aside a workmen's compensation compromise or award." 2 Cal. 3d 964, 975 (1970) (internal citations removed) (citing *Brunski v. Industrial Acc. Com.*, 203 Cal. 761, 764-66 (1928)).  *Johnson*, however, concerns the WCAB's ability to overturn its *own* compromise based on intrinsic fraud, not a court's ability to do so.  Furthermore the portion of *Brunski* that *Johnson* cites for support concerns the statutory window (then 245 weeks) during which the Industrial Accident Commission could overturn a past decision for "good cause shown."  *Brunski v. Indus. Acc. Comm'n*, 203 Cal. 761, 764 (1928)).  There, the court concluded that intrinsic fraud constituted the "good cause" necessary for the Commission to reopen the matter within the window permitted by statute.  *Id*. at 765.  This provides no support for the notion that courts (as opposed to the WCAB itself) can overturn WCAB judgments because of intrinsic fraud.  Further, it suggests that the WCAB cannot overturn its own decision—even if presented with evidence of intrinsic fraud—once the statutory window in which it may reconsider its own decisions has closed.  More recent caselaw confirms these limitations.  The WCAB's "jurisdiction to rescind, alter, or amend" a judgment (including a judgment based on a compromise and release) terminates "five years after the date of injury," at which point "an award may be set aside only upon a showing of . . . 'extrinsic' fraud or mistake." *Smith v. Workers' Comp. Appeals Bd.*, 168 Cal. App. 3d 1160, 1169-70 (1985).

The liens at issue in the instant case date back to 2006 and earlier, well over five years ago.  Because any fraud related to them would be intrinsic rather than extrinsic, they provide no basis even before the WCAB itself to overturn the Settlement

Agreements and resulting WCAB judgment in this case.  The WCAB has not (and now cannot) alter the judgment it entered based on the 2010 Settlement Agreements.  And State Fund has provided no caselaw indicating that this Court may in this case exempt itself from the clear general rule that extrinsic fraud is required to rescind a judgment under California law.  State Fund must therefore look to extrinsic fraud concerning the Settlement Agreements themselves.

### b.  Collusion between Bruce Roth and the Zaks and Khan Defendants

State Fund argues that even if extrinsic fraud were a requirement for rescission of a WCAB settlement, the 2010 Settlement Agreements can be rescinded because there was in fact extrinsic fraud in this case—the alleged collusion and quid pro quo between Roth and the Zaks Defendants.  State Fund asserts that this fraud resulted in the signing of the unfavorable 2009 Settlement Memorandum, and that the Settlement Memorandum's existence compromised State Fund's ability to negotiate the 2010 Settlement Agreements because it did so facing the looming possibility that the Settlement Memorandum itself would remain in effect absent a superseding agreement.

To prove the existence of a conspiracy to commit fraud under California law, a plaintiff must show "(1) the formation and operation of the conspiracy, (2) wrongful conduct in furtherance of the conspiracy, and (3) damages arising from the wrongful conduct."  *Kidron v. Movie Acquisition Corp.*, 40 Cal. App. 4th 1571, 1581 (1995).  "The *sine qua non* of a conspiratorial agreement is the knowledge on the part of the alleged conspirators of its unlawful objective and their intent to aid in achieving that objective."  *Id.* at 1582.  "Conspiracies cannot be established by suspicions," and "[m]ere association does not make a conspiracy."  *Id.*

Here, no direct evidence would enable a reasonable trier of fact to conclude that a conspiracy between Roth and any defendant existed.  Roth, Solakyan, Dr. Khan, Dr. Zaks, and Dr. Zaks's two attorneys have all testified or declared under penalty of perjury that there was no collusion and that there was no offer of employment or any other consideration given to Roth in exchange for his negotiation and approval of the 2009 Settlement Memorandum.  (SUF ¶¶ 58-59.)  No documentary evidence of any kind directly establishes impermissible concerted action between Roth and any other party, and no other witness has testified to any conspiracy.

Nonetheless, evidence of a conspiracy "need not be explicit, but may be inferred from circumstantial evidence."  *United States v. Melchor-Lopez*, 627 F.2d 886, 891 (9th Cir. 1980).  Inferences of the existence of such an agreement may be drawn if there is "concert of action, [with] all the parties working together understandingly, with a single design for the accomplishment of a single purpose."  *United States v. Monroe*, 552 F.2d 860, 862-63 (9th Cir. 1977).  But where—as here—a plaintiff attempts to prove a conspiracy though an inference rather than direct evidence, the inference must be "reasonable."  *Aguilar v. Atl. Richfield Co.*, 25 Cal. 4th 826, 861-67 (2001), as modified (July 11, 2001); *see also Goldstrass v. Sec.-First Nat. bank of Los Angeles*, 149 Cal App. 2d 808, 810-21 (1957) (inferences of conspiracy must be more than "speculative and conjectural").  An inference of conspiracy from circumstantial evidence is reasonable only if the evidence "implies unlawful conspiracy [is] *more likely than*" independent action.  *Aguilar*, 25 Cal. 4th at 857; *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 588 (1986) (quoting *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 764 (1984) (to show conspiracy, a plaintiff "must present evidence 'that tends to exclude the possibility' that the alleged conspirators acted independently.").

State Fund asserts that Roth colluded with the Zaks Defendants in exchange for his later employment at Global Holdings, a firm owned by Sam Solakyan, a friend of Drs.

Zaks and Khan.  But though there are open questions about why Roth entered into the Settlement Memorandum with the Zaks Entities, the fact remains that after three years of litigation and extensive discovery, State Fund has found no evidence of contact between Roth and the Zaks Defendants outside of the one meeting where the Settlement Memorandum was signed in the presence of the Zaks Defendants' counsel.  Nor has State Fund found evidence tending to indicate that Dr. Zaks, Dr. Khan, or anyone else directed Sam Solakyan to hire Roth at Global Holdings.  After methodically reviewing the evidence that the parties presented and holding an extended motion hearing on the subject, the Court concludes that State Fund has failed to provide sufficient evidence for a reasonable juror to conclude that it was more likely than not that Roth colluded with any of the defendants by agreeing to settle the case in exchange for being hired at Global Holdings.

To support its theory of collusion involving a quid pro quo, State Fund has directed the Court to the following facts: (1) Roth did not have settlement authority to enter the Settlement Memorandum; (2) Roth had detailed settlement negotiations with Zaks Defendants without telling others at State Fund and while those others were under the impression that the case would continue until judgment; (3) Roth mentioned his upcoming retirement several times during settlement negotiations; (4) the 2009 Settlement Memorandum was structured to make multiple small payments so the deal would not require management approval; (5) Roth initially concealed the settlement from his supervisors; (6) there was ongoing contact between Solakyan and Dr. Zaks and Solakyan and Dr. Khan; (7) Dr. Zaks made several personal loans to Dr. Khan; and (8) Roth was eventually employed at Global Holdings.

But these data points are not sufficient to permit a jury to infer collusion.  At best, these facts demonstrate inappropriate unilateral action on Roth's part, not concerted

activity with the Zaks Defendants.  There are also many holes and gaps in the facts relied on by State Fund to prove concerted activity by Roth and the Zaks Defendants.

State Fund asserts that during the summer of 2009 Roth had settlement discussions with the Zaks Defendants, yet did not disclose that he was in settlement talks to either State Fund's claims personnel or his own supervisors.  (SF ##86-87.)  State Fund further asserts that during these settlement talks and in related emails from that period, Roth mentioned his retirement several times.  State Fund characterizes this as a thinly-veiled attempt to obtain post-retirement employment through Dr. Zaks.  State Fund has not, however, cited any testimony indicating that Roth expressed an interest in post-retirement *employment*.  The Zaks Defendants' counsel indicated that he thought Roth's comments about retirement were an effort to get the Zaks Defendants to settle quickly.  (SF #89.)  In one email to the Zaks Defendants' counsel, Roth indicated that "State Fund has provided me with the authority to propose the following as a way to avoid continuing the litigation and reasons given the WCAB [sic] past delays that will extend the case well past my retirement date."  (CE Ex. 43.)  Dr. Zaks's lawyer explained in deposition testimony that Roth mentioned his retirement, "in my mind, for the purpose of saying to us there will be new counsel coming into this case, and it's going to start up all over again, and it's going to take years.  And I think it was just—it was a negotiating strategy."  (CT Ex. 34 at 126:3-21.)  Because nothing in the record indicates that Roth ever expressed interest in post-retirement employment, his comments that he would retire soon do little to support State Fund's theory that he was seeking out an illicit benefit from the Zaks Defendants.

Nor does Roth's obfuscatory conduct surrounding the negotiation and execution of the Settlement Memorandum demonstrate a conspiracy with the Zaks Defendants.  On August 17, 2009, Roth met with State Fund claims management personnel—who would typically be consulted before any settlement—and conveyed the Zaks Defendants' demands.  The Senior Claims Manager and others in attendance deemed the demands to

be "outrageous" and "ridiculous."  When deposed, the Senior Claims Manager testified that Roth "scoffed" at the demands along with the rest of the meeting attendees and appeared to be in agreement with them ."  (SF ##92-93.)  The decision was made at that meeting to go "gung ho" and "fight this as a company."  (State Fund Compendium of Transcripts ("CT") Ex. 26 at 179:8-15.)  After the August 2009 meeting, Roth reported to Dr. Zaks's counsel that he was "having a difficult time with claims management due to the fact that the proposed settlement is 'millions' of dollars" and that he had "a concern about the management approvals necessary for the resolution of these cases."  (Dkt. 300-3, CE Ex. 32.)  In light of these concerns, the Zaks Entities' Counsel pointed out to Roth in an email that the reason the settlement figure was in the millions of dollars was that 1,200 cases had been consolidated and suggested that "if State Fund simply makes the payments related to the 1200+ specific cases, that virtually all will be settled for less than reserves, which we assume would not have a management approval issue."  (*Id.*)

In early October 2009, Roth told State Fund legal and claims representatives that he was confident State Fund was going to win upcoming hearings in the arbitration.  (SF #99.)  Around October 7, 2009, Roth told his supervisor that he was going to meet the Zaks Defendants to discuss the upcoming arbitration hearings—he did not disclose that the purpose of this meeting was actually to negotiate a final settlement.  (SF ##100-01.)  That week, another State Fund supervising attorney asked Roth for an update on cases pertaining to ambulatory service centers, a subset of the cases in dispute with the Zaks Defendants.  (SF #102.)  Specifically, she asked for the current demand and offer, the current status of the cases, a description of settlement efforts to date, and an assessment of whether settlement discussions would be fruitful in the event that they had not yet been attempted.  (*Id.*)  Roth indicated that he was busy, but that he would get her a response that Friday, October 9, the day he signed the Settlement Memorandum.  (*Id.*)

On October 9, 2009, Roth met with Dr. Zaks and his counsel to discuss settlement with the Zaks Entities in the WCAB arbitration.  (SF #103.)  That day, Roth and Dr. Zaks executed the Settlement Memorandum, which compromised State Fund's claims and defenses to the Zaks Entities' allegedly fraudulent liens.  (SF #105.)  State Fund asserts that Roth and the Zaks Entities structured the deal to allow for payment on a claim-by-claim basis across about 1,200 claims rather than as a lump sum in order to hide the settlement from Roth's superiors and State Fund's claims department.  (SF # 112.)

The State Fund claims representative that Roth worked with on the WCAB action reported that she was "blind-sided" when she learned that Roth had settled the case.  (SF #115.)  Everyone else at State Fund who was connected to the case shared her surprise.  The Settlement Memorandum required State Fund to pay more than Roth's earlier estimates about the settlement value of the case, and included interest, whereas State Fund's practice was to negotiate settlements in which it would not have to pay interest.  (SF ## 113-14.)  The Settlement Memorandum also contains no clause releasing State Fund from liability upon its payment of the settled claims, which was a departure from State Fund's standard practice.  (SF #118.)

State Fund further notes that the Settlement Memorandum contained an agreement to settle the claims of Zaks Entity Comprehensive Outpatient Surgery Center (COSC), even though COSC was not a party to the WCAB Action and Roth was not the State Fund Attorney handling COSC's case.  (SF # 106.)  Other evidence in the record indicates that including COSC in the settlement was a genuine error on Roth's part, as Roth contacted the Zaks Entities' counsel on Sunday, October 11—two days after the Settlement Memorandum was signed—to discuss altering the language in the agreement indicating that the COSC claims would be settled.  (Dkt. 300-4, CE Ex. 47.)[11]

---

[11] State Fund acknowledges that Roth called the Zaks Entities' counsel to discuss the issue, but cites an email from Roth to his supervisor describing the COSC issue as evidence that Roth knew there was a

Roth's behavior around the signing of the Settlement Memorandum was certainly odd: he was evasive with his State Fund colleagues about the status of the litigation and he failed to obtain approval for the settlement from either his own supervisor or State Fund's claims department.  But again, the evidence from this period fails to prove that he colluded with the Zaks Defendants.  Though Zaks's counsel suggested settling the individual claims at below State Fund's reserves for each claim in order to avoid the need to obtain management approval, the email in which he makes that suggestion shows no sign that he thought structuring a settlement in that manner would violate State Fund policy.  (CE Ex. 32.)  And other evidence in the record seriously undermines State Fund's allegation that the Zaks Defendants illicitly conspired with Roth to hide the settlement from others at State Fund by entering 1,200 low-dollar settlements: Patrick Christoff, counsel for the Zaks Entities, called State Fund attorney Robert Wilson on October 12, *the very next business day* after the settlement was reached, in order to implement the Settlement Memorandum Roth had signed.  (Dkt. 258-25, Christoff Decl. ¶ 10.)[12]  This is not the behavior of a party seeking to hide an illicit agreement.

---

term pertaining to COSC in the Settlement Memorandum.  (SGD ¶ 16, citing CE Ex. 54.)  Roth's email, however, corroborates his assertion that he had *not* intended to settle the COSC claims, and had only agreed to insert general language into the agreement indicating that State Fund would use its "best efforts" when evaluating the liens.  (CE. Ex. 54.)

[12] Though Christoff submitted a declaration stating that he made this call to Wilson at State Fund on October 12, 2009, State Fund disputes this fact.  State Fund cites the deposition of State Fund attorney Patricia Brown, who testified about how she first became aware that Bruce Roth had entered a settlement with Zaks Entities.  (CT. Ex. 4, Brown Dep. at 145:17-147:11.)  By her own admission, however, Brown was uncertain who had made the call to Wilson.  At her deposition, she stated that "[m]y recollection is not clear in this area," though she believed it was a lien claimant who had contacted Wilson.  (*Id.* at 145:20-23.)  Brown recalled that she had no direct discussion with this lien claimant, but rather that Wilson told her about his discussion with the lien claimant.  (*Id.* at 146:11-22.)  Asked if the person Wilson talked to was Christoff, Brown said, "No, it was a lien—it was a hearing rep."  (*Id.* at147:5-7.)  When asked if she was sure about that, Brown said "Well, it's been a number of years so I'm not a hundred percent certain.  That's my best recollection is it was a hearing rep that he talked to."  (*Id.* at 147:8-11.)  State Fund cites nothing other than Brown's uncertain testimony to refute Christoff's affidavit asserting that he called Wilson on October 12.

State Fund also asserts that it had assumed Roth had signed the Settlement Memorandum simply due to his weakness or incompetence, but that when it discovered he was working for Global Holdings—which also employed Dr. Khan—all became clear. But the problem for State Fund is that there is virtually no evidence of concerted action between Roth and any Defendant in this case to exchange Roth's signing of the Settlement Memorandum for nonparty Sam Solakyan hiring him at Global Holdings.

In furtherance of its theory, State Fund asserts that Roth told another employee that "some opportunities came up" and that "one door closes and another opens up" before he left State Fund.  (SF #135.)[13]  State Fund also notes that Dr. Khan was the Chief Medical Officer at Global Holdings at the time of Roth's hiring.  In an effort to connect the dots between Dr. Zaks (a party to the WCAB action), Dr. Khan (not a party to the WCAB action), and Mr. Solakyan (not a party to either the WCAB action or this action), State Fund notes that Dr. Zaks had made three short-term loans to Dr. Khan totaling $700,000 to purchase real estate in the months leading up to Roth's hiring[14] and that both Dr. Zaks and Dr. Khan were friends with Solakyan.  State Fund has introduced telephone records indicating that from October 2009 through April 2010, Drs. Khan and Zaks had spoken

---

A memorandum prepared on October 29, 2009 by State Fund's outside counsel after interviewing Roth is in accord with Christoff's testimony.  It reads "MONDAY OCTOBER 12: Rob Wilson, the State Fund attorney handling Comprehensive claims gets a call from Patrick Christoff talking about settlement for Comprehensive."  The memo is based on Roth's testimony during an interview and it is unclear how Roth came to know about the call.  (Dkt. 259-4, Murphy Decl. Ex. 24, Sonnenschein Memo at 14.)

Given Brown's admitted uncertainty about who called Wilson, the lack of deposition testimony from Wilson himself, and the clear testimony of Christoff on the matter, the Court concludes that no reasonable juror would conclude that it was a lien claimant or a hearing officer—as opposed to Christoff—who called Wilson on October 12, 2009.

[13] The Court could not locate this language in the exhibit State Fund cited in SF #135, CD Ex. 5 ¶ 12, Ex. L.  Nonetheless, for the sake of ruling on this motion, the Court will assume that the statement is in the record, as it does not alter the Court's ultimate conclusion.

[14] The Zaks Defendants have introduced evidence that Dr. Khan repaid each loan within weeks.  (Dkt. 307-10, Zaks Supp. Decl. ¶¶ 1-5, Ex. 1.)

with each other on the phone 30 times, Solakyan and Dr. Zaks had spoken with each
other on the telephone 53 times, and Solakyan and Khan spoke with each other on the
telephone 276 times.  (SF #137.)  Nonetheless, "frequent phone calls do not prove a
conspiracy, they only prove that individuals were in contact."  *Beaman v. Souk*, 7 F.
Supp. 3d 805, 828 (C.D. Ill. 2014).  And State Fund has not identified anything
incriminating about these calls between avowed friends and business associates.

Additionally, on April 19, 2010, in the hours before Solakyan hired Roth, Solakyan
spoke on the phone multiple times with both Drs. Zaks and Khan.  (SF #138.)  Left
unmentioned in State Fund's papers is Solakyan's testimony that he initiated a call to Dr.
Zaks right around the time he was planning to hire Roth because he was excited about
hiring a "bigshot, as I call them from the insurance side, that would take my company to
the next level."  (CT. Ex. 36 at 105:13-18.)  Solakyan testified that he called Dr. Zaks
because he "was asking a few friends and associates in the industry about their opinions
or their advice or their thoughts on the matter."  (*Id.*)  Solakyan recalled that Dr. Zaks
"was not fond" of Roth and said Roth "was not a great lawyer."  (*Id.* at 106:12-14.)
According to Solakyan, Dr. Zaks said "something along the lines of 'fuck him'" when
Solakyan mentioned Roth and "was obviously angry because they were in litigation or
something like that at the time."  (*Id.* at 106:15-19.)

According to Solakyan, Dr. Khan was more equivocal and said something like
"whatever you decide, I will support."  (*Id.* at 162:11-12.)  Solakyan also testified that
"Dr. Khan is not very much into the business side.  So unless it's medicine or MRI
machines, [it] doesn't really flow his juices too much."  (*Id.* at 163:5-6.)  Solakyan
indicated that he himself was "very excited" about hiring Roth because it would "bring
up my street cred to hire Bruce Roth in my company, and [Dr. Khan] was excited for
me . . . but I don't remember any particulars of him saying, Bruce, you know, is great or
bad."  (*Id.* at 163:20-21.)  At his deposition, Solakyan testified that he hired Roth only

because Roth was the "best candidate for the job."  (Dkt. 259-40, Murphy Decl. Ex. 60, Solakyan Dep. at 202:13-15.)  He noted that Global Holdings was a small company that would benefit from Roth's 20 years of experience on the "other side" of workers' compensation litigation.  (*Id.* at 92:1-3.)  Solakyan stressed that because of Roth's long experience at State Fund "at the highest levels he knew the rules and regulations of workers' comp."  (*Id.* at 91:23-92:1.)

State Fund also asserts that by working for Global Holdings while also drawing his retirement from CalPERS, Roth increased his income by over 99%, from $9,478 per month to $18,887.19 per month.  (SF #142.)  This figure is inflated, however, because it includes Roth's State Fund pension from CalPERS, which amounts to $4,325.01 per month.  (SF #142.)  Presumably Roth would be able to draw his retirement from State Fund whether he worked for Global Holdings, another employer, or simply remained unemployed.  State Fund also fails to account for the fact that Roth did not resign from State Fund—he was by all accounts terminated from State Fund several months after he entered into the Settlement Memorandum.

In the end—after several years of litigation—State Fund has not come forth with evidence that "implies unlawful conspiracy [was] more likely than" innocent or unilateral action.  *Aguilar*, 25 Cal. 4th at 857.  State Fund has provided no phone logs, emails, or testimony indicating that there was any direct contact between Roth and Dr. Zaks, Dr. Khan, or their counsel that made his decision to enter into the Settlement Memorandum anything other than an arm's-length transaction.  And it has failed to adequately address evidence undermining its theory, such as the call from the Zaks Entities' attorney to State Fund Attorney Wilson made very soon after Roth signed the 2009 Settlement Memorandum.  No reasonable trier of fact could determine that the evidence in the record makes it more likely that Roth entered into the Settlement Memorandum out of a desire for personal gain rather than out of frustration with how the litigation was progressing or

a sense that it was the best option available for State Fund.  And though Roth's later affiliation with Global Holdings is notable given its connection to Dr. Khan and Sam Solakyan's friendship with both Drs. Zaks and Khan, that information is hardly surprising: all four men worked in the same industry, Roth had been terminated from State Fund, and Roth needed a job.  Furthermore, State Fund has not pointed to any evidence in the record that would call into question Solakyan's apparent excitement about the prospect of hiring Roth.  As Solakyan noted, Roth was an industry veteran with an inside perspective on the claims process.  There is no indication that he was unqualified for the job with Global Holdings, that his salary was higher than the salary of others hired to perform a similar role, or that he would have needed to resort to illicit means to secure a job like the one he landed at Global Holdings.  On the contrary, the available evidence indicates that Roth did exactly what many people would do upon being terminated from a government job in the insurance industry—he looked for a comparable job in the private sector and found one for which he was qualified.

### c.  Connivance

A party's connivance is a valid basis to rescind an agreement.  Cal. Civ. Code § 1689(b)(2).  Under California law, connivance exists where a defendant takes advantage of a third party's fraud or duress to enter into an agreement with an innocent party.  *Leeper v. Beltrami*, 53 Cal. 2d 195, 206 (1959).  State Fund asserts that when Dr. Zaks executed the Settlement Memorandum, "he knew that Roth was acting without authority, and that State Fund would not have approved it."  (SF # 110.)  According to State Fund, after State Fund asserted that Roth had no authority to enter into the 2009 Settlement Memorandum, Dr. Zaks aggressively moved to enforce it based on Roth's "ostensible authority," despite knowing full well at the time the Settlement Agreement was signed that Roth lacked the authority to execute it—behavior which would qualify as connivance.

State Fund's allegation is not, however, supported by the underlying record.  Roth himself emailed the Zaks Entities' counsel on October 6, three days before he entered into the Settlement Memorandum, to inform them that "State Fund has provided me with the authority to propose the following as a way to avoid continuing the litigation and recons given the WCAB past delays that will extent [sic] the case well beyond my retirement date," followed by a list of proposed settlement figures that served as a basis for the October 9, 2009 settlement negotiation.  (CE Ex. 43.)  Roth's statement about being in contact with State Fund concerning settlement figures conveyed the message that Roth was in contact with his superiors at State Fund, that his superiors knew the status of the litigation, and that Roth had obtained authority to settle the case.  There is no evidence that Roth ever indicated to any of the Zaks Defendants that he did not have authority to settle the case on the terms under which it was ultimately settled, or that he had structured the settlement in a way that State Fund would not permit.  Because the record does not support the theory that Zaks knew Roth lacked settlement authority, State Fund's attempt to rescind the Settlement Agreements based on Zaks's connivance must fail.

### 4.  Conclusions Regarding the Zaks Defendants

The 2010 Settlement Agreements remain binding on the Zaks Entities and State Fund.  State Fund has failed to prove the extrinsic fraud or connivance necessary to warrant rescission of those agreements, which were freely entered into by the parties with no involvement from Roth and while State Fund had in its possession all of the evidence about the Zaks Defendants' allegedly fraudulent lien claims.  After several years of discovery, State Fund has failed to obtain sufficient evidence to support either its theory that the 2009 Settlement Memorandum was the result of a quid pro quo between Roth and any defendant in this case, or that Dr. Zaks had a reason to know Roth lacked settlement authority to enter into the 2009 Agreement.  Accordingly, the Settlement

Agreement is enforceable and State Fund released the Zaks Defendants from fraud and civil RICO claims which it had against them on that date.  And as discussed here, State Fund has not provided sufficient evidence of any activity by the Zaks Defendants that would give rise to a fraud or civil RICO claim against them after the 2010 Settlement Agreements were signed.  Accordingly, the Zaks Defendants' motion for summary judgment is GRANTED.

### B.  Bruce Roth's Motion for Summary Judgment

State Fund's civil RICO allegations against Roth are based on Roth's alleged collusion and quid pro quo with the Zaks Defendants: Roth's signing of the 2009 Settlement Memorandum in exchange for a job with Global Holdings.  But as discussed in detail with respect to the Zaks Defendants' motion, there is not sufficient evidence in the record of concerted action between Roth and any defendant to support State Fund's allegation that Roth colluded with anyone.  Without this concerted action, the claims against Roth must fail.  Accordingly, Roth's motion for summary judgment is GRANTED.

### C.  The Khan Defendants' Motion for Summary Judgment

Having failed to provide sufficient evidence of Roth's involvement in the alleged RICO conspiracy illicit enterprise, or any fraud on the part of the Zaks and Khan Defendants with respect to Roth's hiring at Global Holdings, it is not apparent how State Fund could maintain its RICO claims against the Khan Defendants.  Dr. Khan's involvement in Roth's hiring and Roth's involvement in the alleged fraudulent enterprise is at the center of State Fund's theory of this case.  Without Roth, State Fund is now left with (1) allegations that Zaks and Khan created an enterprise to file fraudulent medical claims with it from 2002 to approximately 2006, when State Fund first alleged before the

WCAB that the Zaks Entities' and Khan Entities' liens were fraudulent, and (2) its assertion that the Khan Defendants committed fraud by filing a federal case in 2011, *Physicians Mobile Medical Group v. State Compensation Insurance Fund*, Case No. SACV-11-01282, in which they attempted to collect on some claims they allegedly sold to a third-party collection firm in 2009.  (Pl.'s Opp'n Br. at 30-31.)

With respect to the claims running from 2002 to 2006, the Khan Defendants have adopted the Zaks Defendants' arguments, made in a separate motion, (Dkt. 262), that State Fund's claims that accrued prior to 2008 are barred by the 4-year statute of limitations for RICO claims.  (Dkt. 274-1, Khan Defs.' Br. in support of Mot. Summ. J. at 19.)  In response to this statute of limitations argument, State Fund asserts that its claims must be equitably tolled for the duration of the time they were before the WCAB.  (Dkt. 288, Pl.'s Opp'n to Zaks Defs.' Statute of Limitations Mot. at 5-8.)  The Ninth Circuit has, however, refused to accept this tolling argument in very similar circumstances involving the assertion of a RICO claim outside of the four-year statute of limitations.  *Grimmett v. Brown*, 75 F.3d 506, 515-16 (9th Cir. 1996).  In *Grimmett*, the plaintiff argued that RICO's four-year statute of limitations was tolled while she pursued a narrower version of the same RICO theory in bankruptcy court.  *Id.*  The Ninth Circuit reasoned that because a bankruptcy court's primary jurisdiction is not RICO claims, federal courts and bankruptcy courts are "more properly considered 'parallel avenues of relief.'"  *Id.*  The plaintiff could have simultaneously pursued her RICO claim in federal court and because she did not do so, the bankruptcy proceeding did not toll her RICO claim.  *Id.*; *see also Conley v. Int'l Bhd. Of Elec. Workers, Local 369*, 810 F2d 913, 915 (9th Cir. 1987) ("[e]quitable tolling is most appropriate when the plaintiff is required to avail himself of an alternate course of action as a precondition to filing suit").  Like the *Grimmett* plaintiff, State Fund could have simultaneously pursued its RICO claim in federal court while litigating the WCAB proceeding.  Equitable tolling therefore offers it

no relief here and its claims running back to the Khan Defendants' actions from 2002 to
2006 are time-barred.[15]

And alleged fraud related to the 2011 lawsuit involves the Khan Entities' decision
to pursue claims it had sold to a third party—it does not concern concerted action
between the Khan Defendants and Roth or the Zaks Defendants.  State Fund's allegations
in this case assert an enterprise between the Khan Defendants, the Zaks Defendants, and
Roth, not simply concerted action amongst the Khan Defendants to collect on claims they
no longer owned.  State Fund cannot keep its RICO claims alive as pled based solely on
the Khan Defendants' conduct in 2011.

## V. CONCLUSION

Accordingly, the Defendants' motions for summary judgment are GRANTED.[16]

DATED:      March 8, 2016

_____
CORMAC J. CARNEY

UNITED STATES DISTRICT JUDGE

---

[15] The Ninth Circuit has applied the injury discovery rule to RICO claims.  *Pincay v. Andrews*, 238 F.3d
1106, 1109 (2001).  Under that rule, the statute of limitations is tolled until the plaintiff knows or should
have known of the injury underlying the cause of action.  *Id*.  But here, State Fund alleged fraud against
both the Zaks Entities and the Khan Entities in 2006, so the injury discovery rule cannot extend the
RICO statute of limitations until 2012, when this action was filed.

[16] Because the Court has granted summary judgment on all claims with respect to all defendants, it
hereby DENIES as moot the Zaks Defendants' outstanding Motion to Strike State Law Fraud Claim
Pursuant to California's Anti-SLAPP Statute, (Dkt. 261), and the Zaks Defendants' Motion for
Summary Adjudication as to the Issue of Damages Barred by the Statute of Limitations.  (Dkt. 262.)