1  MANATT, PHELPS & PHILLIPS, LLP
   Kenneth B. Julian (CA Bar No. 149840)
2  kjulian@manatt com
   Phillip R. Kaplan (CA Bar No. 076949)
3  pkaplan@manatt.com
   Keli N. Osaki (CA Bar No. 179920)
4  kosaki@manatt.com
   695 Town Center Drive, 14th Floor
5  Costa Mesa, CA 92626
   Telephone: (714) 371-2500 **/** Facsimile: (714) 371-2550
6
7
   STATE COMPENSATION INSURANCE FUND
8  Alexandra Montgomery (CA Bar No. 228276)
   amontgomery@scif.com
9  Gina Marie Ong (CA Bar No. 204137)
   gmong@scif.com
10 1750 E. Fourth Street, Suite 500
   Santa Ana, CA 9270)
11 Telephone: (714) 347-6130 **/** Facsimile: (714) 347-6145
12
   Attorneys for Plaintiff
13 STATE COMPENSATION INSURANCE FUND, a Public
   Enterprise Fund and Independent Agency of the State of
14 California
15
16              **UNITED STATES DISTRICT COURT**
17     **CENTRAL DISTRICT OF CALIFORNIA, SOUTHERN DIVISION**

| | |
|---|---|
| 18 STATE COMPENSATION<br>INSURANCE FUND, a Public<br>19 Enterprise Fund and Independent<br>Agency of the State of California,<br>20         Plaintiff,<br>21     v.<br>22<br>SANA ULLAH KHAN, an individual,<br>23 *et al.*,<br>24         Defendants.<br>25<br>26 AND RELATED COUNTERCLAIM. | Case No. SACV12-01072 CJC (JCGx)<br><br>Honorable Cormac J. Carney<br><br>**DECLARATION OF GERALD G.<br>KNAPTON IN SUPPORT OF<br>PLAINTIFF STATE<br>COMPENSATION INSURANCE<br>FUND'S OPPOSITION TO THE<br>ZAKS DEFENDANTS' MOTION<br>FOR ATTORNEYS' FEES;<br>EXHIBITS "1" THROUGH "6"** |

27
28

## DECLARATION OF GERALD G. KNAPTON

1.      I, Gerald G. Knapton, make this declaration in support of Plaintiff State Compensation Insurance Fund's ("State Fund") Opposition to the Zaks Defendants' Motion for Attorney Fees in Case No. SACV12-01072 CJC (JCGx).  I am making this Declaration as an expert witness, based on matter (including my specialized knowledge, skill, experience, training and education) perceived by, or personally known to me, or made known to me that is of a type that may reasonably be relied upon by an expert in forming an opinion upon the subject to which my testimony relates.

### I.      BACKGROUND AND QUALIFICATIONS OF EXPERT

2.      My background, qualifications as an expert, and experience is more fully set forth in Exhibit 1 attached to this Declaration.  I was educated at Brown University, U.C., Berkeley, and the School of Law at U.C.L.A.  I am an attorney at law licensed to practice in the State of California, and I am admitted to all federal courts within California and the Court of Appeals for the Ninth and Third Circuits. I am a partner/shareholder of the law firm Ropers, Majeski, Kohn & Bentley, which has offices in Los Angeles (where I am based), San Francisco, Redwood City, San Jose, New York City, and Boston.  I have been at Ropers Majeski since July 2002, and most of my time is spent as an expert for billing and ethical issues.

3.      I have personally reviewed far over $4.0 billion dollars in legal fees and work product.  I have reviewed hourly legal bills for professional services and supporting work product in many appeals and trials.  Many of my fee matters have included a RICO claim as part of the litigation.  I have also reviewed hourly legal bills and supporting work product in cases involving allegations of fraud, Qui Tam billing cases, contract disputes,  FEHA, age and other kinds of discrimination, employment matters, overtime cases, "donning & doffing" cases, as well as a vast assortment of other matters such as banking disputes, employment retaliation claims, wage & labor matters, individual & class actions in statutory-interpretation

matters, pharmaceutical cases, "Brown Act" compliance matters, notice compliance matters (for "clean water act" and "catalyst" cases), accounting cases, "civil rights" cases, retail credit compliance litigation, truth in lending lawsuits, discrimination lawsuits, FSLA lawsuits, and individual actions for a great variety of clients who have questions about the charges.

4.     My past experience as an expert includes reviewing the bills and work product for requests for attorney fees.  I have reviewed hundreds of motions to shift fees for cases in both trial and appellate court, and in arbitration.  Many of these motions were based on "attorney's fee provisions," codes, or statutes.  I have also reviewed fees to determine the reasonableness of such fees, including for those to be submitted as part of a settlement or as part of a motion to shift fees.  I have reviewed work product and actual legal bills for law firms, corporations, partnerships, insurance companies, cities, counties, trustees, and individuals for legal work in trial courts and for appellate work.  My firm submits its legal bills via Tymetrix360, so I am familiar with that program.

5.     I have also written and lectured on the issue of reasonableness and allocation of legal fees.  I have been qualified, and testified, as an expert witness on attorney fees on approximately 50 occasions—including before both judges and juries in trials and in arbitrations.  Of these 50 matters, two were in the Central District of California: one of which was a bench trial and the other was a jury trial.

## II.     FACTUAL BACKGROUND

6.     I understand the facts of this matter to be as follows.  On July 2, 2012, a Complaint commencing the instant action was filed.  It alleged causes of action for: (1) Civil RICO (18 U.S.C. § 1962(c); (2) Conspiracy to Commit Civil RICO (18 U.S.C. § 1962(d); (3) Fraud; and (4) Violation of Cal. Government Code §

1090.[1]  The Complaint did not seek rescission of the parties' prior Settlement Agreements, and was summarized as follows:

### SUMMARY OF ACTION

1. Defendants in this case conspired and participated in a scheme to defraud State Fund in connection with the submission, demands for payment, and collection of fraudulent insurance claims for medical services, diagnostic testing, and ancillary services (collectively, "Medical Services") under State Fund-issued policies of workers' compensation insurance. In particular, defendants: (a) formed and operated medical facilities which were operated as patient mills; (b) submitted insurance claims to State Fund for Medical Services that were never rendered or were medically unnecessary; (c) submitted bills for services at substantially higher rates than are allowed under the Official Medical Fee Schedule ("OMFS") which governs rates that may be charged for certain services which are rendered in workers' compensation cases; and (d) engaged in other conduct designed to fraudulently induce State Fund to pay such claims, including, without limitation, demanding payment for liens that defendants no longer owned. In doing so, defendants violated, among other laws, the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961 et seq. ("RICO").

7.      On September 14, 2012, State Fund filed a First Amended Complaint (the "FAC"), which alleged causes of action for: (1) Civil RICO (18 U.S.C. § 1962(c)); and (2) Conspiracy to Commit Civil RICO (18 U.S.C. § 1962(d)).  The FAC did not seek rescission of the parties' prior Settlement Agreement, and it included the same "SUMMARY OF ACTION" as the original Complaint.

8.      On January 28, 2013, State Fund filed a Second Amended Complaint (the "SAC"), which alleged causes of action for: (1) Civil RICO (18 U.S.C. § 1962(c)); (2) Conspiracy to Commit Civil RICO (18 U.S.C. § 1962(d)); and (3)

---

[1] This statute is entitled "Contracts, sales, and purchases made in official capacity."

Fraud.  The SAC included a similar Summary of Action section, and further alleged in pertinent part:

> 71. Beginning in approximately July 2009, acting with intent to defraud State Fund and to further the Fraudulent Scheme, Roth secretly engineered a settlement agreement with the above-named Zaks entities, which obligated State Fund to pay between 100% to 140% of the value of such liens and included interest and penalties (the "Fraudulent Settlement"). As Roth was aware, in other similar settlement agreements, State Fund typically paid a small percentage of the billed amount and almost never paid any interest or penalties. In fact, in an email dated December 5, 2008, just six months prior to entering into settlement talks with the Zaks entities, Roth estimated that the settlement value of the liens of the Zaks entities would range from 22% to a high of 42% of the face value of the liens. In doing so, Roth knowingly acted without State Fund's knowledge or consent and took affirmative steps to conceal the unauthorized settlement agreement from State Fund.  Furthermore, State Fund is informed and believes, and thereon alleges, that Roth, who had already indicated in October of 2009 that he wanted to settle the liens so that the case did not extend "well past my retirement date," pursued the Fraudulent Settlement with the expectation that he would receive a monetary benefit and/or employment from one or more of the Controlling Defendants and/or the Fraudulent Medical Providers and their affiliates. . . .

> 85. Had Roth disclosed to State Fund the true facts about the Settlement Memorandum and the settlement discussions leading to the surreptitious execution of that document, State Fund would have taken steps to prevent Roth from executing the Settlement Memorandum on State Fund's behalf, and would have prevented Roth from engaging in settlement discussions with respect to the Zaks Entities Liens and COSC Liens without the involvement of the Claims Department and/or obtaining the required approvals. . . .

91. At the time State Fund entered into the Re-Settlement Agreements, it was unaware: (a) that Roth had defrauded State Fund in pursuing the Fraudulent Settlement; (b) on information and belief, that Roth had pursued the Fraudulent Settlement with the expectation that he would receive a monetary benefit and/or employment from one or more of the Controlling Defendants and/or the Fraudulent Medical Providers and their affiliates; (c) on information and belief, that one or more of the Controlling Defendants and/or the Fraudulent Medical Providers had provided Roth with implied or direct assurances of a monetary benefit and/or employment in exchange for facilitating the Fraudulent Settlement; and/or (d) on information and belief, that prior to executing the Re-Settlement Agreements and at a time when State Fund was still investigating the circumstances that led to the execution of the Settlement Memorandum by Roth, Roth had already discussed, negotiated and/or accepted employment at Global Holdings, Inc., an entity owned and controlled by Controlling Defendant Khan. To the contrary, in asserting that the Settlement Memorandum should be enforced against State Fund, Zaks asserted that Roth had actual and ostensible authority to bind State Fund to the settlement. Had State Fund known such facts, it would not have entered into the Re-Settlement Agreements.

92. The Re-Settlement Agreements also contain release provisions. Such release provisions are unenforceable as against State Fund because of the fraud committed by Defendants, as alleged herein, in connection with the Re-Settlement Agreements.

9.  On March 8, 2016, the Court executed its Order Granting Defendants' Motions for Summary Judgment, which concluded in pertinent part: "The 2010 Settlement Agreements remain binding on the Zaks Entities and State Fund. State Fund has failed to prove the extrinsic fraud or connivance necessary to warrant rescission of those agreements, which were freely entered into by the parties with

no involvement from Roth and while State Fund had in its possession all of the evidence about the Zaks Defendants' allegedly fraudulent lien claims."

10. On April 4, 2016, State Fund filed a Notice of Appeal of the Court's Summary Judgment Order.

### III.  THE FEE MOTION

11. On April 15, 2016, The Zaks Defendants' Notice of Motion and Motion for Attorneys' Fees was filed (the "Fee Motion").  The Notice of Motion states in pertinent part:

> Specifically, the Zaks Defendants seek attorneys' fees and out-of-pocket costs in the amount of $4,433,495.44 and $1,149,772.56, respectively, while requesting permission to submit a supplemental declaration at the conclusion of all briefing and argument on this motion for all additional attorneys' fees and costs incurred after March 31, 2016.
>
> The Zaks Defendants' motion is made on the following grounds: First, under the express terms of the Re-Settlement Agreements, the Zaks Defendants are entitled to an award of reasonable attorneys' fees. The attorneys' fees clause, which was included in the Re-Settlement Agreements at the insistence of the Zaks Defendants, entitles the "prevailing party" in a "proceeding to enforce the terms of this Agreement" to "its reasonable attorneys' fees." The Zaks Defendants won on summary judgment and are therefore the prevailing party. This litigation involved a "proceeding to enforce the terms of the agreement," since SCIF sought rescission of the Re-Settlement Agreements, the Zaks Defendants raised the releases in the Re-Settlement Agreements as an affirmative defense and as the basis for a declaratory relief counterclaim, and the Court's order granting summary judgment to the Defendants rested on the enforceability of the Settlement Agreements. California case law confirms the Zaks Defendants' entitlement to the fees they seek here.

# IV.    THE FEE-SHIFTING AUTHORITY

12.    For me to conduct my analysis, it was essential to examine the fee provision at issue in this proceeding because that affects the analysis needed to assist the Court.  The papers I have reviewed indicate that the Zaks defendants seek to recover their legal fees and costs pursuant to the Settlement Agreements.  The only fee-shifting provision set forth in those Settlement Agreements is the "Enforcement" language, which states in full: "In the event either party is required to bring a proceeding to enforce the terms of this Agreement, the prevailing party in such proceeding shall be entitled to its reasonable attorneys' fees."

13.    In my experience, this kind of fee-shifting provision language has a very limited scope.  It does not shift experts' charges, and it does not shift "costs" beyond the statutory costs listed in 28 U.S.C. § 1920.  I am very familiar with this type of language because part of my practice involves drafting retainer letters and fee-shifting language, which is something that I have performed for many years. Many of my fee assignments include allocation issues that arise out of the "attorney's fees" or indemnity language.  In my experience, more expansive attorney-fee language is usually indicated by the phrases "arising out of" or "in any way related to" the matter.  Drafting the Settlement Agreements to read to "enforce the terms of this Agreement" is narrow in scope and does not extend to tort claims or other unrelated matters.

14.    It is my understanding that _if_ the Court determines that the conditions of the Settlement Agreements have been satisfied, then the traditional lodestar approach is applied.  The lodestar is calculated by assembling the reasonable time and applying the reasonable rate in the community for noncontingent litigation of the same type, pursuant to the relevant and settled law for fee-shifting as I know it:

> The objective starting point in the attorney fee analysis is the lodestar figure. The lodestar figure is calculated using the reasonable rate for comparable legal services in the

local community for noncontingent litigation of the same type, multiplied by the reasonable number of hours spent on the case. Thus, a court's use of reasonable rates in the local community, as an integral part of the initial lodestar equation, is one of the means of providing some objectivity to the process of determining reasonable attorney fees. Such objectivity is vital to the prestige of the bar and the courts.

*Nichols v. City of Taft*, 155 Cal. App. 4th 1233, 1242-43 (2007) (internal citations omitted).

## V.   HOURLY RATE ANALYSIS

15.   The Zaks Defendants' Fee Motion is based on the above-cited provision of the Settlement Agreements.  The Fee Motion and its supporting papers reflect charges by three law firms, Silverman & Milligan; Murphy Rosen; and Barlit Beck Herman Palenchar & Scott (collectively "the Firms"), for the following amounts:[2]

| Firm | Fees | Statutory Costs | Non-Statutory Costs | Total |
|---|---|---|---|---|
| Silverman & Milligan | $594,268.74 $11,201.50 | $760.98 | $25,468.96 | $631,701.18 |
| Murphy Rosen | $2,231,818.25 $78,408.20 | $52,497.79 | $658,834.55 | $3,021,558.79 |
| Bartlit Beck | $1,517,797.75 | $2,776.84 | $465,469.05 | $1,986,043.64 |
| All firms | $4,433,495.44 | $56,035.61 | $1,149,772.56 | $5,648,823.59 |

16.   I have therefore examined the Firms' bills regarding the rates requested, and compared those rates with the objective evidence of rates in the community, as discussed below.

## A.   The Real Rate Report

17.   The Real Rate Report pulls its data from the TyMetrix360 set of invoices that are submitted and paid.  I use TyMetrix and I have worked on matters

___

[2] As discussed below at ¶¶ 50-51, there are several anomalies between the moving papers and the actual bills filed in support of the Fee Motion, as well as some problems with the bills themselves.  In such cases, I have used the charges reflected by the actual time billing entries in the analysis below.

that required me to interview the TyMetrix staff and TyMetrix customer staff, so I am very familiar with the way it works.  In order to process the invoices, there must be an agreed-upon budget and there must be an agreed-upon staff with specified hourly rates.  Because of this, I am satisfied that this information has validity.  I am also impressed by the correlation between what the data shows and what I see in invoices from many law firms.  The data used for the 2015 Real Rate Report Snapshot includes "more than $9.8 billion in fees billed for legal services in the United States during the three-year period from 2012 to 2014. The data comprise fees actually paid by 96 companies to more than 4,500 law firms and more than 151,000 timekeepers."  A complete copy of the Real Rate Report is attached to the Summers Declaration filed in support of the Fee Motion as Exhibit 6.

18.     As explained at page 183 of Exhibit 6 to the Summers Declaration, the Real Rate Report assembles the data from the TyMetrix360 billing program and LegalVIEW in several ways that are relevant here, as discussed below.  Pages 1-6 and 181-182 of Exhibit 6 to the Summers Declaration specifically set forth its contents, methodology and procedures.

19.     Attached hereto as Exhibit 2 is a true and correct copy of page 127 of the 2015 Real Rate Report, which reflects applicable Corporate and General Liability rates for attorneys of three types of defense firms, i.e., those in the first quartile, the median, and the third quartile.  The "mean" rate reflected in this Exhibit is the average rate that seems very much in line with what other firms are actually charging in the Los Angeles area.  This case is a standard "fraud" case, which means that is not the type of matter, such as a class action or securities case, that justifies wages at the top 25% (the third quartile) of the data.  Based on my experience, I therefore believe that the "mean" rate reflected in this Exhibit is appropriate for this matter.

**B.      USAO Attorney's Fee Matrix (Formerly the Laffey Matrix) – Exhibit 3**

20.     The Laffey Matrix derived its name from a seminal case. *Laffey v. Northwest Airlines, Inc.*, 572 F. Supp. 354 (D.D.C.1983), aff'd in part, rev'd in part on other grounds, 746 F.2d 4 (D.C. Cir. 1984), cert. denied, 472 U.S. 1021 (1985). This is a free resource published each year by the U.S. Attorney's office for the District of Columbia.  It offers tiered rates for lawyers, differentiated according to their years of experience.

21.     The name of the Laffey Matrix has recently been changed to the USAO Attorney's Fee Matrix.  (Available at, http://www.justice.gov/usao-dc/file/796471/download.)

22.     These rates are accepted in the Washington, D.C. area courts as one factor to consider when setting fees.  Some courts in other areas also use the Laffey Matrix, but these courts are required to make adjustments to take into account the cost of a local lawyer's time.  One simple way to take into account the cost of a local lawyer's time is to use federal wage data (available at www.bls.gov/oes) to establish other cities' average wages for lawyers, as compared to that of the District of Columbia. *Garnes v. Barnhardt*, No. C 02-4428 VRW, 2006 WL249522, at *7 (N.D. Cal. Jan. 31, 2006); *see also Chanel, Inc. v. Doan*, 2007 WL 781976, at *6-7 (N.D. Cal. Mar. 13, 2007); *Syers Props. III, Inc. v. Rankin*, 226 Cal. App. 4th 691, 702 (2014).  Therefore, the Laffey Matrix data for the District of Columbia needs to be adjusted upwards or downwards to apply in the local venue.  Again, the Bureau of Labor Statistics publishes lawyer's wage data for many locations that make it easy to see how the cost of lawyering varies by city.

23.     Attached hereto as Exhibit 3 is a true and correct copy of the May 2015 wage data (the latest available) for legal occupations in the District of Columbia, Los Angeles, and Santa Ana from the Bureau of Labor Statistics.  The data shows that wages are 5% higher in L.A. as compared to D.C., but 4% lower in Santa Ana as compared to D.C.  These three tables in Exhibit 3 reflect the

adjustments of this Laffey Matrix—with supporting foundational documentation—for the Santa Ana area.  Because this litigation is pending in Santa Ana, I believe that the rates for that location are appropriate.  Those rates are as follows:

**USAO ATTORNEY'S FEES MATRIX[3] – 2015 – 2016**
*(Revised Methodology starting with 2015-2016 Year)*
(Hourly Rate for June 1 – May 31, based on change in PPI-OL since January 2011)

Hourly Rates for DC and as adjusted for Los Angeles* and Santa Ana**:

| Years of Experience | 2015-16 (DC) | Los Angeles | Santa Ana |
|---|---|---|---|
| 31+ years | $568 | $596 | $545 |
| 21-30 years | $530 | $557 | $509 |
| 16-20 years | $504 | $529 | $484 |
| 11-15 years | $455 | $478 | $437 |
| 8-10 years | $386 | $405 | $371 |
| 6-7 years | $332 | $349 | $319 |
| 4-5 years | $325 | $341 | $312 |
| 2-3 years | $315 | $331 | $302 |
| Less than 2 years | $284 | $298 | $273 |
| Paralegals & Law Clerks | $154 | $136 | $119 |

\*    The DC rate for lawyers' time is adjusted to 105% for Los Angeles.
The DC rate for paralegals and legal assistants' time is adjusted to 88% for Los Angeles.

\*\*  The DC rate for lawyers' time is adjusted to 96% for Santa Ana.
The DC rate for paralegals and legal assistants' time is adjusted to 77% for Santa Ana.

These are adjustments using the latest U.S. Bureau of Labor Statistics data for the venues.

24.    The following table lists the rates being requested by Silverman & Milligan (3 lawyer firm) and Theodora Oringher PC (46 lawyer firm), as compared to the objective evidence of the Real Rate Report's Corporate rates (column titled "RR Corp $"), the Real Rate Report's General Liability rates (column titled "RR G/L"), and the Santa Ana Laffey Fee Matrix (column titled  "Laffey Santa Ana $"):

Silverman & Milligan (3 lawyer firm) (and Theodora Oringher PC- 46 lawyer firm):

| Person | Work dates | Experience | Rate(s) requested | RR Corp $ | RR G/L | Laffey Santa Ana $ |
|---|---|---|---|---|---|---|
| Attorneys |  |  |  |  |  |  |
| Silverman, Stephen |  | 1967 | $595 | $404 | $269 | $545 |
| Polonsky, Polina |  | 12/1/2010 | $295 - $350 | $269 | $190 | $312 |

---

[3] Formerly known as the Laffey Matrix.  See https://www.justice.gov/usao-dc/file/796471/download

| Dizenfeld, Bruce | | 1978 | $575 | $404 | $269 | $545 |
|---|---|---|---|---|---|---|

1,043.45 hours total for the firm Silverman & Milligan, plus 19.8 hours by Mr. Dizenfeld for the firm Theodora Oringher PC.

25.     Because the hourly rates requested by the firms Silverman & Milligan and Theodora Oringher PC are within the general range of the rates reflected by the Real Rate Report and the Laffey Matrix, I have not adjusted the rates for these firms.  Therefore, the rates in Exhibits 4-6 contain the requested rates by Silverman & Milligan and Theodora Oringher PC.

26.     The following table lists the rates being requested by Murphy Rosen (6 lawyer firm) as compared to the Real Rate Report and the Laffey Matrix, discussed above:

Murphy Rosen (6 lawyer firm):

| Person | Work dates | Experience | Rate(s) requested | RR  Corp $ | RR G/L | Laffey Santa Ana $ |
|---|---|---|---|---|---|---|
| Attorneys | | | | | | |
| Murphy, Paul | | 1992 | $450 | $404 | $269 | $437 |
| Rosen, David | | 1991 | $475 - $450 | $404 | $269 | $437 |
| Rosen, Joanne | | 1991 | $400 | $269 | $190 | $437 |
| Newberry, Jodi | | 1991 | $400 | $269 | $190 | $437 |
| Nagle, Mark | | 2007 | $300 - $325 | $269 | $190 | $371 |
| Arevian, Shaunt | | 2005 | $350 | $269 | $190 | $371 |
| Liang, Jason | | 2007 | $325 | $269 | $190 | $371 |
| Steele, Taylor | | 2015 (2012-Texas) | $350 | $269 | $190 | $312 |
| Harris, Jesyka | | 2009 | $250 | $269 | $190 | $312 |
| | | | | | | |

5,887.2 hours total for the Murphy Rosen firm.

27.     Because the hourly rates requested by the Murphy Rosen firm are within the general range of the rates reflected by the Real Rate Report's Corporate rates, the Real Rate Report's General Liability rates, and the Santa Ana Laffey Fee

Matrix, I have not adjusted the rates for this firm.  Therefore, the rates in Exhibits 4-6 contain the requested rates by Murphy Rosen.

28.    The following table lists the rates being requested by Bartlit Beck Herman Palenchar & Scott LLP (82 lawyer firm) as compared to the Real Rate Report and the Laffey Matrix, discussed above:

Bartlit Beck Herman Palenchar & Scott LLP (82 lawyer firm):

| Person | Work dates | Experience | Rate(s) requested | RR Corp. $ | RR G/L | Laffey Santa Ana $ |
|---|---|---|---|---|---|---|
| Attorneys | | | | | | |
| Summers, Glen | | 1994 | $850 - $890 | $542 | $456 | $437 |
| Giulianelli, Karma | | 1996 | $800 - $840 | $542 | $327 | $371 |
| Murray, Jason | | 2011 | $600 - $670 | $337 | $327 | $312 |
| Doman, Joe | | 2012 | $560 | $337 | $327 | $312 |
| Wheeler, Alison | | 1995 | $730 | $542 | $327 | $371 |
| Paralegals | | | | | | |
| Seggelink, Anita | | 30+ | $325 - $340 | $162 | $141 | $119 |
| Costner, Elizabeth | | 6+ years | $325 | $162 | $141 | $119 |
| McPherson, Catherine | | 30 | $325 | $162 | $141 | $119 |
| Grimmett, Renee | | 28 | $340 | $162 | $141 | $119 |
| Case Assistants | | | | | | |
| Schilken, Stephanie | | 15+ | $220 - $230 | N/A | N/A | $119 |
| Tindall, Andrea | | 15 | $230 | N/A | N/A | $119 |
| Docket Clerk | | | | | | |
| Vigil, Elsa | | 20+ | $230 | N/A | N/A | $119 |

2,366.43 hours for the firm Bartlit Beck Herman Palenchar & Scott LLP.

29.    The website for Bartlit Beck Herman Palenchar & Scott LLP ("Bartlit Beck") includes the following statement regarding the firm's billing practices:

> We do not charge by the hour.  Instead, we enter into fee agreements that reward success and efficiency.  Our goal in each case is to negotiate a fee structure that will ensure that our interests and the client's are fully aligned.  Our

- 14 -

firm's approach to fees ensures that we remain focused on results.

(Available at http://www.bartlit-beck.com/why-results.html.)

30.     In addition, when I was a member of the Council on Litigation Management, I attended their annual meetings.  Bartlit Beck was a member, and some of its lawyers also attended the annual meetings.  I was informed by an attorney at the firm that they did not bill by the hour.  Rather, they bill for an entire case or for a specific project, such as a preliminary injunction or for a motion for summary judgment.  At lunch when I asked Mr. Beck how much his firm would charge for a motion for summary judgment, he replied that it depended on the circumstances, but was usually in the range of $100,000 to $250,000.

31.     In this mater, Bartlit Beck has submitted bills in support of the Fee Motion that reflect hourly rate charges.  However, that is <u>not</u> how the firm charges.  Therefore, the bills submitted by the firm in support of the Fee Motion appear to be based on hypothetical hourly rates and rough estimates of the hours billed for specific legal tasks.  Consequently, Bartlit Beck has not provided this Court or State Fund with full and complete information regarding the way that it is <u>actually</u> compensated.  The firm, therefore, appears to be avoiding an honest and straightforward statement of how much it has agreed to charge for its work regarding the Zaks Defendants' motion for summary judgment ("MSJ").

32.     Because the hourly rates requested by Bartlit Beck are <u>not</u> within the general range of the rates reflected by the Real Rate Report and the Laffey Matrix set forth above, I have adjusted the rates for this firm using the highest rates reflected by the Real Rate Report and the Laffey Matrix.  The rates that I have applied are set forth in a bolded and italicized font on the following table:

Bartlit Beck Herman Palenchar & Scott LLP

| Person | Work dates | Experience | Rate(s) requested | RR Corp. $ | RR G/L | Laffey Santa Ana $ |
|--------|-----------|-----------|------------------|-----------|--------|--------------------|
| Attorneys | | | | | | |

| | | | | | | |
|---|---|---|---|---|---|---|
| Summers, Glen | | 1994 | $850 - $890 | *$542* | $456 | $437 |
| Giulianelli, Karma | | 1996 | $800 - $840 | *$542* | $327 | $371 |
| Murray, Jason | | 2011 | $600 - $670 | *$337* | $327 | $312 |
| Doman, Joe | | 2012 | $560 | *$337* | $327 | $312 |
| Wheeler, Alison | | 1995 | $730 | *$542* | $327 | $371 |
| Paralegals | | | | | | |
| Seggelink, Anita | | 30+ | $325 - $340 | *$162* | $141 | $119 |
| Costner, Elizabeth | | 6+ years | $325 | *$162* | $141 | $119 |
| McPherson, Catherine | | 30 | $325 | *$162* | $141 | $119 |
| Grimmett, Renee | | 28 | $340 | *$162* | $141 | $119 |
| Case Assistants | | | | | | |
| Schilken, Stephanie | | 15+ | $220 - $230 | N/A | N/A | *$119* |
| Tindall, Andrea | | 15 | $230 | N/A | N/A | *$119* |
| Docket Clerk | | | | | | |
| Vigil, Elsa | | 20+ | $230 | N/A | N/A | *$119* |

33.    The rate adjustments for the firm Barlit Beck are applied to Exhibits 4-6. Exhibit 4 is a spreadsheet with bills from the Firms and Theodora Oringher PC. The bills are arranged in chronological order. A true and correct copy of this spreadsheet with all of the bills is attached as Exhibit 4. I subtracted from the Firms' original balance of **$4,327,540.50**[4] the rate adjustments applied to Bartlit Beck. As shown in **Exhibit 4**, these hourly rate adjustments resulted in the following being discounted from the total amount being sought in the Fee Motion:

| Original Balance | Adjustment | Adjusted Balance |
|---|---|---|
| $4,327,540.50 | -$632,880.44 | $3,694,660.06 |

[4] As noted in footnote 2, *supra*, ¶¶ 50-51 identify several anomalies between the moving papers and the actual bills filed in support of the Fee Motion, as well as some problems with the bills themselves. In such cases, I have used the charges reflected by the actual time billing entries in the analysis below. This has resulted in an initial balance of **$4,327,540.50**, as compared with the Firms' fee request of **$4,433,495.44**.

## VI.    THE FEES SOUGHT BY THIS MOTION ARE EXCESSIVE AND/OR VAGUE

34.    My comparison of the time billing entries filed in support of the Fee Motion as compared to the case file documents and other evidence has revealed the following examples of excessive billing.

35.    On September 15, 2015, Glen Summers of Bartlit Beck billed **12.0** hours for work described as: "Attend Zaks deposition."  However, the transcript of the deposition for that day indicates that it commenced at 10:08 a.m. and concluded at 7:24 p.m., or approximately **9.3** hours including breaks.  Therefore, this charge appears to be excessive.

36.    On September 16, 2015, Glen Summers of Bartlit Beck billed **10.0** hours for work described as: "Attend Zaks deposition."  However, the transcript of the deposition for that day indicates that it commenced at 9:42 a.m. and concluded at 6:43 p.m., or approximately **9.0** hours including breaks.  Therefore, this charge appears to be excessive.

37.    On September 23, 2015, Karma Giulianelli of Bartlit Beck billed **14.0** hours for work described as: "Attend Roth deposition."  However, the transcript of the Roth deposition for that day indicates that it commenced at 9:24 a.m. and concluded at 9:02 p.m., or approximately **11.6** hours including breaks.  Therefore, this charge appears to be excessive.

38.    On October 12, 2015, Paul Murphy of Murphy Rosen billed **14.0** hours for work described as: "Travel to and attend deposition of C. Newman."  However, the transcript of the deposition for that day indicates that it commenced at 1:35 p.m. and concluded at 7:33 p.m., or approximately **6.0** hours including breaks.  Even considering travel time to San Francisco for this deposition, this charge appears to be excessive.

- 17 -

39.     On November 24, 2015, Glen Summers of Bartlit Beck billed **11.0** hours for work described as: "Work on summary judgment motion; emails and tel. cons. re same."  This charge appears to be excessive.

40.     On November 30, 2015, Glen Summers of Bartlit Beck billed **12.5** hours for work described as: "Edit summary judgment motion and supporting papers."  On that same day, Jason Murray of Bartlit Beck billed **12.0** hours for work simply described as: "MSJ."  These charges appear to be excessive.

41.     On December 1, 2015, Anita Seggelink of Bartlit billed **12.5** hours for work described as: "Work on declarations, exhibits, SUF."  On that same day, Glen Summers billed **16.0** hours for work described as: "Edit summary judgment motion and supporting papers, including to reflect final comments from clients and co-counsel; emails and tel. cons. re same."  On that same day, Jason Murray of Bartlit billed **12.0** hours for work simply described as: "MSJ."  These charges clearly appear to be excessive.

42.     The next day, December 2, 2015, Jason Murray billed another **12.0** hours for work simply described as: "MSJ."  That same day, Anita Seggelink of Bartlit billed **12.5** hours for work described as: "Finalize and file summary judgment motion and all supporting documents."  These charges appear to be excessive.

43.     On January 13, 2016, Jason Murray billed **10.0** hours for work described as: "MSJ reply."

44.     On January 18, 2016, Jason Murray billed another **10.0** hours for work described as: "MSJ reply."

45.     On February 20, 2016, Karma Giulianelli of Bartlit Beck billed **11.0** hours for work described as: "Take Kessler deposition; reports to team re same."  However, the transcript of the deposition for that day indicates that it commenced at 9:03 a.m. and concluded at 6:05 p.m., or approximately **9.0** hours including breaks.  This charge therefore appears to be excessive.

46.     On February 27, 2016, Jason Murray billed **16.0** hours for work described as: "Kessler Daubert motion."  The next day, he billed another **15.0** hours for work described as: "Kessler Daubert motion."  These charges therefore appear to be excessive.

47.     The examples set forth above are for illustrative purposes only in order to show how counsel have assembled their bills in this matter.  As explained in section VII, D., below, I have adjusted the relevant excessive time billing entries in Exhibit 5E, which is attached hereto.

## VII.   ANALYSIS OF TIME BILLING ENTRIES

48.     I respectfully submit for the Court's consideration the following analysis in Exhibits 5A-6 regarding the time billing entries filed in support of the Fee Motion.

49.     The Chief Justice of the United States has recognized that in the context of fee-shifting motions, the prevailing attorneys seeking to recover their fees from the losing party have a <u>heightened duty</u> to provide clear, convincing and detailed explanations of their charges:

> I read the Court's opinion as requiring that when a lawyer seeks to have his adversary pay the fees of the prevailing party, **the lawyer must provide detailed records of the time and services for which fees are sought**. It would be inconceivable that the prevailing party should not be required to establish at least as much to support a claim under 42 U. S. C. § 1988 as a lawyer would be required to show if his own client challenged the fees. A district judge may not, in my view, authorize the payment of attorney's fees unless the attorney involved has established by **clear and convincing evidence** the time and effort claimed and shown that the time expended was necessary to achieve the results obtained.
>
> A claim for legal services presented by the prevailing party to the losing party pursuant to § 1988 presents quite

a different situation from a bill that a lawyer presents to his own client. In the latter case, the attorney and client have presumably built up a relationship of mutual trust and respect; the client has confidence that his lawyer has exercised the appropriate 'billing judgment,' and unless challenged by the client, the billing does not need the kind of extensive documentation necessary for a payment under § 1988. That statute requires the losing party in a civil rights action to bear the cost of his adversary's attorney and there is, of course, **no relationship of trust and confidence between the adverse parties**. As a result, the party who seeks payment must keep records in sufficient detail that a neutral judge can make a fair evaluation of the time expended, the nature and need for the service, and the reasonable fees to be allowed.

*Hensley v. Eckerhart*, 461 U.S. 424, 440-41 (1983) (Burger, C.J., concurring) (emphasis added).

50.    In order to analyze whether the moving party has provided sufficiently detailed, "clear and convincing" records of the time and services for which fees are sought in this case, we have examined all bills filed in support of the Fee Motion. During this process, we have noted the following issues regarding those bills:

**Murphy Rosen:**

- Billed Hours reported on the Client Ledger Report are rounded up, i.e., 133.75 is 133.8;
- The entries for Invoice #7683 do not total what is indicated on the invoice (473.50/hours and $172,967.50/fee). Our totals: 312.80/hours; $130,750.00/fee;
- Note the discount given for Invoice #7714. Our itemization does not take into consideration this discount for Invoice #7714;
- Client Ledger Report indicates billed hours for Invoice #7874 as 311.3. Actual total is 309.30;

**Silverman & Milligan:**

- Invoice #20467 dated 9/16/14 is missing the first page, therefore there is a difference in the total figures.

**Bartlit Beck:**

- The difference in our totals is a result of Glen Summers' Supplemental description of work entry 7/31/15 for 2.0 hours. In the original spreadsheet, this entry was 0 hour.

    **Theodora Oringher**:

- The invoices are heavily redacted.

51.     Based on reviewing the Firms' attorney fee invoices, I have determined—in my expert opinion—that the starting balance for the Firms' fees should be **$4,327,540.50**, as compared with the Firms' fee request of **$4,433,495.44**. The differences in balance is to reflect the issues addressed in the bullet points above, along with a request for **$78,408** in fees for Pangea3. I have eliminated the requested fees for Pangea3 because they are a legal support service, not a law firm. As such, any invoices for Pangea3 are more appropriately classified as costs and were eliminated from consideration as attorney fees. *See Broadband Itv, Inc. v. Hawaiin Telcom, Inc.*, NO. 14–00169 ACK–RLP, CIVIL NO. 15–00131 ACK–RLP, 2015 WL 9274092, at *5 (D. Haw. Nov. 25, 2015) (refusing to allow prevailing party to recover discovery-related costs under 28 U.S.C. § 1920(4) where the only descriptions were " 'generic statements' that the Ninth Circuit stated were insufficient").

52.     I, along with others working under my supervision, have therefore proceeded to analyze the actual time billing entries set forth in the invoices filed in support of the Fee Motion. In order to perform this work, we have entered each such billing entries into a Microsoft Excel spreadsheet database that was prepared under my supervision and control. A true and correct copy of this complete database report is attached hereto as Exhibit 4. We have arranged the time entries of all the timekeepers in chronological order, and have added only the comments to the right of the column labeled "Description."

53.     The time billing entries included in Exhibit 4 have been coded using
the eight columns on the right side of the page labeled A to H.  An "x" in a line
under a column may be understood according to this key as follows:

> A = Administrative work;
> B = Block billing;
> C = Vague descriptions;
> D = Duplicative work;
> E = Excessive time;
> F = Rounded off entries;
> G = WC/RICO charges; and
> H = Settlement Fraud Charges.

54.     The deductions for Column "H" of Exhibit 4 are not included in the
fee adjustment procedure described below because Column H is clearly identifiable
fees that relate to the settlement fraud/rescission issue.  The fees identified in
Column H were placed into Exhibit 5H, and all such fees are recoverable under the
Settlement Agreements.  Exhibit 5H is a true and correct copy of all invoices that
identify the settlement fraud/rescission issue.  Exhibit 5H is discussed in section
VII, below.

55.     Attached hereto as Exhibits 5A – 5G are true and correct copies of
additional spreadsheets.  To perform our analysis in Exhibits 5A – 5G, we began by
identifying all bills that had an "x" placed in a line.  Each bill with its appropriately
marked "x" was then placed into its corresponding spreadsheet in Exhibit 5A – 5G.

56.     To avoid placing an invoice into multiple exhibits, which would result
in "double dipping" by taking multiple deductions for the same billing entry, we
carefully identified those invoices that belonged in two or more possible categories.
We then made a copy of Exhibit 4, and deleted all checked boxes indicating
objectionable categories, except for one such box for each entry.  For example, if a
single time billing entry had lines in both columns A and B checked, we retained
the check for the line in column A but deleted the check for the line in column B.
Thus, we carefully performed our analysis in order to avoid deducting the charge
for an entry twice.

57.    The order of Exhibits 5A – 5G are discussed in non-alphabetical order. Employing the methodology described above, I have analyzed the bills filed in support of the Fee Motion as follows:

1.    G = WC/RICO deductions = 100% deduction (Exhibit 5G);
2.    A = Administrative work = 100% deduction (Exhibit 5A);
3.    D = Duplicative work = 100% deduction (Exhibit 5D);
4.    E = Excessive time billed = 40% deduction (Exhibit 5E);
5.    C = Vague descriptions = 30% deduction (Exhibit 5C);
6.    B = Block-billed descriptions = 30% deduction (Exhibit 5B); and
7.    F = Rounded off entries = 10% deduction (Exhibit 5F).

## A.    Column "G" - WC/RICO Deductions (Exhibit 5G)

58.    All invoices that were appropriately marked in Column "G" of Exhibit 4 were placed in Exhibit 5G.  A true and correct copy of Exhibit 5G is attached hereto.

59.    As discussed above, the instant Fee Motion is entirely based on the parties' Settlement Agreements.  The only fee-shifting provision set forth in the Settlement Agreement is the "Enforcement" language, which states in full:

In the event either party is required to bring a proceeding to enforce the terms of this Agreement, the prevailing party in such proceeding shall be entitled to its reasonable attorneys' fees.

60.    This kind of fee-shifting provision has a very limited scope.  It does not shift experts' charges and it does not shift costs beyond the statutory costs listed in 28 U.S.C. § 1920.

61.    State Fund did not seek rescission of the Settlement Agreements until the filing of the SAC on **January 28, 2013**.  The first billing entry filed in support of the Fee Motion that mentions work connected with the SAC was dated **January 29, 2013**.  Therefore, work performed by defense counsel before that date does not fall within the above-cited fee-shifting provision included in the Settlement Agreements, so charges for such work **cannot** be shifted.  I have thus included all charges by defense counsel that predate January 29, 2013 in this category, i.e.,

Exhibit 5G.  I have calculated that the Zaks Defendants' fees up until State Fund filed the SAC on January 28, 2013 equaled **$242,663.25**.  It is my opinion that they are not entitled to these fees.

62.     The Zaks Defendants are <u>not</u> entitled to recover fees under RICO. *Chang v. Chen*, 95 F.3d 27, 28 (9th Cir. 1996).  I have therefore included all such <u>clearly identifiable charges relating to RICO in this category</u>, i.e., Exhibit 5G. Exhibit 5G is a true and correct copy of all time entries identified related to RICO, as well as billing entries referencing the National Crime Victimization Survey ("NCV").

63.     In addition, all clearly identifiable charges relating to Workers' Compensation fraud and related medical issues are included in Exhibit 5G because such charges were not incurred with respect to the enforcement of the Settlement Agreement, and therefore do not fall within its fee-shifting provision.  Thus, Exhibit 5G is also a true and correct copy of all time entries identified that relate to Workers' Compensation fraud and related medical issues. This includes work related to the depositions of Mark Lundgren, David Homes, Saif Bajwa, Regina Homes, Robert Palmer, Linda Smith, Joseph Lozano, Michael Mayer, Rudolph Garza, Teresa Hanna, Abbas Mehdi, Charles Affatato,  Lorene Hebert, Marisela Vargas, Daniel Reyes, Donald Lower, Daniel Kessler, and Laurentius Marais.  I have been informed and believe that these depositions were related to the Workers' Compensation fraud, and thus do not pertain to the enforcement of the Settlement Agreements.

64.     Charges relating to Qualified Medical Examiner ("QME") issues, the Official Medical Fee Schedule ("OMFS"), Quantitative Functional Capacity Evaluation ("QFCE"), Cardiovascular Credentialing International ("CCI"), and Electronic Adjudication Management System (EAMS)—a computer-based case management system that simplified and improved the Division of Workers'

Compensation (DWC) case management process[5]—are also included in this category because they clearly relate to Workers Compensation fraud, and thus do not relate to the enforcement of the Settlement Agreement.

65.     Any time billing entries that either (1) "block" charges regarding tasks that both include what was described above and included a charge unrelated to Exhibit 5G, as well as (2) time billing entries that were too vague to determine which category they belonged under were not included in Exhibit 5G.  These types of charges are discussed in section VII, below.

66.     Therefore, Exhibit 5G was compiled after identifying all of the relevant invoices that fell within Column "G" of Exhibit 4.  Exhibit 5G was carefully constructed to avoid possible duplication of invoices.  To determine the "Adjusted Balance," I subtracted the previous balance from Exhibit 4, **$3,694,660.06**, by the amount of <u>all the fee invoices</u> that were placed into Exhibit 5G: **$579,513.75**.  This adjustment reduces the allowable fees as reflected below in the "Adjusted Balance" column.

| Previous Balance | Column "G" | Adjusted Balance |
|---|---|---|
| $3,694,660.06 | -$579,513.75 | $3,115,146.31 |

**B.     Column "A" - Administrative Work (Exhibit 5A)**

67.     All invoices that were appropriately marked in Column "A" of Exhibit 4 were placed in Exhibit 5A.  A true and correct copy of Exhibit 5A is attached hereto.

68.     In my experience, billing entries reflecting administrative work should not be paid.  This includes work such as filing and serving documents and contacting the court regarding scheduling matters, which should be performed by secretaries or other non-billing firm personnel.  Such work should not be billed to

---

[5] *See* http://www.dir.ca.gov/dwc/eams/eams.htm.

the client in the usual attorney-client relationship, and should therefore not be included in a fee-shifting motion.

69.     Any and all time billing entries that fell within this category were placed into Exhibit 5A.  Exhibit 5A was carefully constructed to avoid possible duplication of invoices.  To determine the "Adjusted Balance," I subtracted from the previous balance, **$3,115,146.31**, by all of the invoices that were placed into Exhibit 5A: **$10,622.50**.  This adjustment reduces the allowable fees as reflected below in the "Adjusted Balance" column.

| Previous Balance | Column "A" | Adjusted Balance |
|---|---|---|
| $3,115,146.31 | -$10,622.50 | $3,104,523.81 |

C.     **Column "D" - Duplicative Work (Exhibit 5D)**

70.     All invoices that were appropriately marked in Column "D" of Exhibit 4 were placed in Exhibit 5D.  A true and correct copy of Exhibit 5D is attached hereto.

71.     Entries within Exhibit 5D reflect billable hours that appear to have been repeated by various attorneys, such as the serial and successive reviewing and preparing of documents, as well as conferences between the attorneys and multiple appearances at depositions and hearings.  However, as consistent with my past experience, I have allowed the time billed by the most senior attorney for each firm involved in such conferences and appearances.

72.     Any and all time billing entries that fell within this category were placed into Exhibit 5D.  Exhibit 5D was carefully constructed to avoid possible duplication of invoices.  To determine the "Adjusted Balance," I subtracted from the previous balance, **$3,104,523.81**, by all of the invoices that were placed into Exhibit 5D: **$17,922.50**.  This adjustment reduces the allowable fees as reflected below in the "Adjusted Balance" column.

| Previous Balance | Column "D" | Adjusted Balance |
|---|---|---|
| $3,104,523.81 | -$17,922.50 | $3,086,601.31 |

**D.**      **Column "E" – Excessive Time (Exhibit 5E)**

73.      All invoices that were appropriately marked in Column "E" of Exhibit 4 were placed in Exhibit 5E.  A true and correct copy of Exhibit 5E is attached hereto.

74.      Federal courts have disallowed billing for attorneys when their billable hours exceed 9.0 hours in a single day:

> Finally, Attorney 1 lists two days on which she claims to/have billed 11.5 and 11.2 hours, respectively. In my letter of July 16, 1993, awarding fees and costs to Deloitte and Touche, accountants in this case, I observed:
>
> In other cases this Court has previously disallowed hours billed in excess of 9.0 hours in any one day. There are a variety of reasons for doing so, including the Court's perception that efficiency suffers greatly when parties are repeatedly billing in excess of nine hours per day. Additionally, having had private practice experience and fully understanding what it takes to bill an 'honest hour,' I question any bill where a party appears to be seeking to attribute every hour spent at work to a client. Accountants and attorneys are human beings, and not every moment of the working day is productive and billable. Finally, Deloitte's application in its response was silent as to any justification for the repeated 'high billed' days. No emergency (other than self-created) was shown to exist which might justify the charges in some cases.

*In re Maruko Inc.*, 160 B.R. 633, 640 (Bankr. S.D. Cal. 1993).

75.      My own experience confirms the observations of the *In re Maruko* court because an attorney's efficiency decreases dramatically for time billed in excess of 9.0 hours per day.  However, I have considered each time billing entry individually and **have not** rigidly included entries reflecting any specific number of hours billed in a single day in this category.  Time billing entries in this category, therefore, reflect what clearly appears to be excessive time billed for reviewing and

preparing documents, conferences between the attorneys, and multiple appearances at depositions and hearings.  *See* State Bar of California's Committee on Mandatory Fee Arbitration, Arbitration Advisory 98-03, Determination of a "Reasonable" Fee (June 23, 1998); State Bar of California's Committee on Mandatory Fee Arbitration, Arbitration Advisory 03-01, Detecting Attorney Bill Padding (January 29, 2003).

76.     I have also included in this category the examples of excessive billing practices discussed above, along with other billing entries that in my experience clearly appear to be excessive.

77.     The total amount of fees that fall within Column "E" is shown in Exhibit 5E.  Any and all time billing entries that fell within this category were placed into Exhibit 5E.  Exhibit 5E was carefully constructed to avoid possible duplication of invoices.  To determine the "Adjusted Balance," I subtracted from the previous balance, **$3,086,601.31**, by **40%** of the total value of all of the invoices that were placed into Exhibit 5E.  This percentage reduction equaled **$178,899.70**.  This adjustment reduces the allowable fees as reflected below in the "Adjusted Balance" column.

78.     It is my opinion that a **40%** deduction of such entries appears to be a rather conservative estimate of the percentage of time that was overbilled in light of my own experience and the authority set forth above—which discusses the inefficiency of attorney time billed in excess of 9.0 hours in a single day.

| Previous Balance | Column "E" | Adjusted Balance |
|---|---|---|
| $3,086,601.31 | -$178,899.70 | $2,907,701.61 |

**E.     Column "C" - Vague Descriptions (Exhibit 5C)**

79.     All invoices that were appropriately marked in Column "C" of Exhibit 4 were placed in Exhibit 5C.  A true and correct copy of Exhibit 5C is attached hereto.

80. Fee-shifting cases and California Business & Professions Code § 6148 require that legal bills "clearly state the basis thereof." Providing "vague" billing descriptions deprives the client or fee auditor of the ability to accurately assess whether the attorney's billing entries reflect the performance of tasks that were reasonable and necessary. *White v. City of Richmond*, 713 F.2d 458, 461 (9th Cir. 1983) disapproved of on other grounds by *Pa. v. Del. Valley Citizens' Council for Clean Air*, 483 U.S. 711 (1987); *see also In re Donovan*, 877 F.2d 982, 994 (D.C. Cir. 1989); *New York Ass'n for Retarded Children v. Carey*, 711 F.2d 1136, 1148 (2d Cir. 1983).

81. In the fee-shifting context, vague or missing information may relate to the participants and/or subject matter of meetings, telephone conferences or legal work product, as well as the ultimate purpose of such activity. Therefore, vague billing entries such as unexplained meetings, conferences, emails and research warrant a reduction in the fees billed. *H.J., Inc. v. Flygt Corp.*, 925 F.2d 257, 260 (8th Cir. 1991); *In Re Olson*, 884 F.2d 1415, 1428-29 (D.C. Cir. 1989); *see also* State Bar of California's Committee on Mandatory Fee Arbitration, Arbitration Advisory 98-03, Determination of a "Reasonable" Fee (June 23, 1998); State Bar of California's Committee on Mandatory Fee Arbitration, Arbitration Advisory 03-01, Detecting Attorney Bill Padding (January 29, 2003).

82. The total amount of fees that fall within Column "C" is shown in Exhibit 5C. Exhibit 5C was carefully constructed to avoid possible duplication of invoices. To determine the "Adjusted Balance," I subtracted from the previous balance, **$2,907,701.61**, by **30%** of the total value of all of the invoices that were placed into Exhibit 5C. This percentage reduction equaled **$646,693.21**. This adjustment reduces the allowable fees as reflected below in the "Adjusted Balance" column.

83.     I have deducted 30% of such entries because in my experience the objectionable descriptions are simply too vague in the context of a fee-shifting motion.

| Previous Balance | Column "C" | Adjusted Balance |
|---|---|---|
| $2,907,701.61 | -$646,693.21 | $2,261,008.40 |

### F.     Column "B" - Block Billing  (Exhibit 5B)

84.     All invoices that were appropriately marked in Column "B" of Exhibit 4 were placed in Exhibit 5B.  A true and correct copy of Exhibit 5B is attached hereto.

85.     In fee-shifting situations, block billed entries (also called "bundling," "lumping" or "aggregating") combine several discrete tasks into one block of time, which makes it difficult for State Fund, myself or the Court to determine the exact amount of attorney time spent on each task, and therefore whether the time billed is reasonable.  Federal courts may reduce hours, and therefore fee awards, that are billed in block format.  *Welch v. Metro Life Ins. Co.*, 480 F.3d 942, 948 (9th Cir. 2007) (recognizing that district courts have the "authority to reduce hours that are billed in block format," but remanding for lower court to "explain how or why the reduction fairly balances" those hours).

86.     California state courts also disfavor block billing in fee-shifting matters.  *See Christian Research Institute v. Alnor*, 165 Cal. App. 4th 1315, 1329 (2008) ("Similarly, counsel may not submit a plethora of noncompensable, vague, blockbilled attorney time entries . . .").  Where an appropriate adjustment cannot be made because of block billing for recoverable and non-recoverable fees, a court may "exercise its discretion in assigning a reasonable percentage to the entries, or simply cast them aside." *Bell v. Vista Unified School Dist.*, 82 Cal. App. 4th 672, 689 (2000) (emphasis added).

87.     The State Bar of California's Committee on Mandatory Fee Arbitration has concluded that this billing practice can inflate legal fees by up to

30%, and courts have agreed. *Welch*, 480 F.3d at 948 (noting that the district court relied on the State Bar of California's Committee on Mandatory Fee Arbitration); *see also* State Bar of California's Committee on Mandatory Fee Arbitration, Arbitration Advisory 98-03, Determination of a "Reasonable" Fee (June 23, 1998); State Bar of California's Committee on Mandatory Fee Arbitration, Arbitration Advisory 03-01, Detecting Attorney Bill Padding (January 29, 2003).

88.    The attorney seeking to be paid has the burden of establishing that his or her fees and costs are reasonable and necessary through the use of detailed billing statements. *Hensley*, 461 U.S. at 437; *Trs. of the Dirs. Guild of Am.- Producer Pension Benefits Plans v. Tise*, 234 F.3d 415, 427 (9th Cir. 2000). Requests for legal fees may be denied when "block billing" makes it impossible for the attorney to carry this burden. *Leroy v. City of Houston*, 906 F.2d 1068, 1078-1080 & n.19 (5th Cir. 1990).

89.    However, we have not included time billing entries of 0.30 hours or less in this category.

90.    The total amount of fees that fall within Column "B" is shown in Exhibit 5B attached hereto.  Again, some courts have **disallowed all charges** that are block-billed. *Bell*, supra, 82 Cal. App. 4th at 689.  However, in my experience, the usual range of deductions for "block billed" time is 10% to 30%.  Here, because so many of the "block billed" entries are also objectionable because they also contain extremely vague descriptions, it is my opinion that **30%** of the charges should be deducted.

91.    The total amount of fees that fall within Column "B" is shown in Exhibit 5B.  Exhibit 5B was carefully constructed in order to avoid multiple deductions for the same billing entry.  To determine the "Adjusted Balance," I subtracted from the previous balance, **$2,261,008.40**, by **30%** of the total value of all of the invoices that were placed into Exhibit 5B.  This percentage reduction

equaled **$72,780.37**.  This adjustment reduces the allowable fees as reflected below in the "Adjusted Balance" column.

| Previous Balance | Column "B" | Adjusted Balance |
|---|---|---|
| $2,261,008.40 | -$72,780.37 | $2,188,228.03 |

**G.    Column "F" – Rounded Off Billing Entries (Exhibit 5F)**

92.    All invoices that were appropriately marked in Column "F" of Exhibit 4 were placed in Exhibit 5F.  A true and correct copy of Exhibit 5F is attached hereto.

93.    "If the bills show time entries in whole numbers, especially large times such as 8.0, 9.0 or 10.0, these are probably estimates rather than actual time spent and should be scrutinized."  State Bar of California's Committee on Mandatory Fee Arbitration, Arbitration Advisory 2016-02 (March 25, 2016).

94.    My experience has been that such estimated time billing estimates increase the actual time billed by at least 10%.

95.  The total amount of fees that fall within Column "F" is shown in Exhibit 5F.  Exhibit 5F was carefully constructed in order to avoid multiple deductions for the same billing entry.  To determine the "Adjusted Balance," I subtracted from the previous balance, **$2,188,228.03**, by **10%** of the total value of all of the invoices that were placed into Exhibit 5F.  This percentage reduction equaled **$1,509.70**.  This adjustment reduces the allowable fees as reflected below in the "Adjusted Balance" column.

| Previous Balance | Column "F" | Adjusted Balance |
|---|---|---|
| $2,188,228.03 | -$1,509.70 | $2,186,718.33 |

**H.    Re-summarizing Analysis of Time Billing Entries**

96.    I summarize the above analysis as follows:

| | |
|---|---|
| Total dollar amount of invoices: | $4,327,540.50 |
| Hourly rate adjustment: | -$632,880.44 |
| WC/RICO adjustment: | -$579,513.75 |

| | |
|---|---|
| Administrative work: | -$10,622.50 |
| Duplicative work: | -$17,922.50 |
| Excessive time: | -$178,899.70 |
| Vaguely described work: | -$646,693.21 |
| Block Billing: | -$72,780.37 |
| Rounded off entries: | -$1,509.70 |
| **Possible Balance of allowable fees:** | **$2,186,718.33** |

97.    It is my expert opinion based upon my years of experience that the Firms' fee award should be reduced to **$2,186,718.33.**

## VIII.   ALLOCATION ANALYSIS

98.    As discussed above, the Zaks Defendants cannot recover their fees under RICO.  The Fee Motion is thus exclusively based on the fee-shifting provision of the Settlement Agreements.

99.    But there are numerous time billing entries that "block" time billed for the WC/RICO issues with the Settlement Fraud/rescission issue.  There are also time billing entries that are too vague to determine which category they fall into.  It is therefore my opinion that **a further percentage allocation** is needed to appropriately apportion between the RICO and rescission claims.  I have considered the following which I believe to be relevant to assist in determining the appropriate allocation in this litigation.

100.   All parties produced a total of 3,614,517 documents.  Of this total, 96,002 documents related to the settlement fraud/rescission issue, and 3,518,515 documents did not.  This indicates that approximately **97.34%** of all documents produced did <u>not</u> relate to the settlement fraud/rescission issue.

101.   State Fund produced a total of 1,805,388 documents.  Of this total, 52,089 documents related to the settlement fraud/rescission issue, and 1,753,299 documents did not.  This indicates that approximately **97.11%** of documents produced by State Fund did <u>not</u> relate to the settlement fraud/rescission issue.

102.   The Zaks Defendants produced a total of 77,273 documents.  Of this total, 8,515 documents related to the settlement fraud/rescission issue, and 68,758 documents did not.  This indicates that approximately **88.98%** of documents produced by the Zaks Defendants did <u>not</u> relate to the settlement fraud/rescission issue.

103.   The Khan Defendants produced a total of 1,691,888 documents.  Of this total, 1,507 documents related to the settlement fraud/rescission issue, and 1,690,381 documents did not.  This indicates that approximately **99.91%** of documents produced by the Kahn Defendants did <u>not</u> relate to the settlement fraud/rescission issue.

104.   Mr. Roth produced 105 documents, all of which related to the settlement fraud issues.

105.   Third parties produced a total of 39,863 documents.  Of this total, 33,786 documents related to the settlement fraud/rescission issue, and 6,077 documents did not.  This indicates that approximately **15.24%** of documents produced by third parties did <u>not</u> relate to the settlement fraud/rescission issue.

106.   In addition, the amount of clearly identifiable billing descriptions that fell within the **WC/RICO category account for $579,513.75 in charges** (Exhibit 5G), while the clearly
identifiable billing descriptions that fall within the **settlement fraud/rescission issue category account for $719,562.81 in charges** (Exhibit 5H).  This indicates that **44.60%** of the clearly identifiably charges related to the WC/RICO issues.  However, much of this is the result of clearly excessive work performed by defense counsel with respect to the MSJ work, which has been adjusted as discussed above.

107.   Therefore, because the ratios of documents produced by all parties to the litigation overwhelmingly demonstrates that the documents were produced in support of the RICO—not the settlement fraud/rescission claim—I believe that a

1    reasonable, further adjustment of the fees is required to properly apportion between

2    the claims.

3          108.   It is my recommendation, based on my expert experience, that the

4    Court further reduce the previous balance of **$2,186,718.33** by **50%** to avoid

5    overcompensating the Firms.  This adjustment further reduces the allowable fees as

6    reflected below in the "Adjusted Balance" column.

7    | **Previous Balance** | **Adjustment** | **Adjusted Balance** |
     | --- | --- | --- |
8    | $2,186,718.33 | -$1,093,359.16 | $1,093,359.16 |

9                                    IX.    **COSTS**

10         109.   The fee-shifting provision of the Settlement Agreements cited above

11   has a very limited scope.  Therefore, it does <u>not</u> shift experts' charges and it does

12   <u>not</u> shift costs beyond the statutory costs listed in 28 U.S.C. § 1920.

13         110.   A true and correct copy of the Firms' "costs" included in the invoices

14   filed in support of the Fee Motion are set forth in Exhibit 6, attached hereto.  The

15   Firms' non-statutory costs equal **$1,149,772.56**.  However, it is my opinion that

16   such costs are not recoverable under the plain terms of the Settlement Agreements.

17                                    X.    **CONCLUSION**

18         111.   Pursuant to the analysis set forth above, it is my opinion that the

19   defense firms may be entitled to recover their reasonable fees in the amount of

20   **$1,093,359.16**.  However, the Firms are not entitled to recover their non-statutory

21   "costs" pursuant to the terms of the Settlement Agreements.

22

23         I declare under penalty of perjury under the laws of the State of California

24   that the foregoing is true and correct.  Executed on May 19, 2016 at Los Angeles,

25   California.

26

27   _____

28                                      Gerald G. Knapton

- 35 -